ADDISON E. CADY, APPELLANT, v. SOUTH OMAHA
NATIONAL BANK, APPELLEE.

FILED JANUARY 21, 1896.    No. 6173.

1. **Trust Funds:** BANK DEPOSITS. Trust funds do not lose their
character as such by being deposited in bank by the trustee to
his own account.

2. ———: ———. So long as such funds can be traced and distin-
guished in the hands of the trustee or his assigns, they remain
subject to the trust.

3. **Commission Merchants:** BANK DEPOSITS: ACCOUNTING:
LIABILITY OF BANK. F., a commission merchant, deposited in
bank money realized from the sale of live stock consigned to him
by C., his account with the bank being at the time largely over-
drawn. *Held*, Regardless of the question of notice, that the bank
is accountable to C., and that it cannot apply the money so de-
posited in satisfaction of F.'s indebtedness.

4. ———: ———: EVIDENCE: PLEADING. In an action against a
bank for money deposited by the plaintiff's agent to his own
account, evidence of payment by the defendant on checks sub-
sequently drawn by such agent, in good faith, relying upon his
apparent title to said fund, is inadmissible under a general
denial. Such fact to be available as a defense must be specially
pleaded.

APPEAL from the district court of Douglas county.
Heard below before IRVINE, J.

See opinion for statement of the case.

*John C. Watson* and *Frank T. Ransom*, for appellant,
cited: *Gillespie v. Union Stock Yards Nat. Bank*, 41 Fed.
Rep., 231, 137 U. S., 411.

*Charles Offutt, contra :*

The bank did all that could be required of it in refer-
ence to the drafts. Had the bank paid the drafts con-

trary to the orders of Fitch, it would have been liable to
him. (*Marzetti v. Williams*, 1 B. & Ad. [Eng.], 415;
*Patterson v. Marine Nat. Bank*, 18 Atl. Rep. [Pa.], 632;
*First Nat. Bank v. Mason*, 95 Pa. St., 113; *Fonner v.
Smith*, 31 Neb., 107; *Martin v. Rocke*, 53 L. T. n. s.
[Eng.], 946; *Levy v. Cavanagh*, 2 Bosw. [N. Y.], 100;
*Wood v. Boylston Nat. Bank*, 129 Mass., 358; *Justh v.
Nat. Bank of the Commonwealth*, 56 N. Y., 478 ; *South-
wick v. First Nat. Bank of Memphis*, 84 N. Y., 434;
*Thomson v. Clydesdale Bank*, 48 Albany L. J. [Eng.],
324.)

Post, C. J.

This is an equitable proceeding instituted by the appel-
lant, Addison E. Cady, in the district court for Douglas
county, against the appellee, the South Omaha National
Bank, to enforce an accounting by the latter for the pro-
ceeds of a car load of hogs, by the plaintiff consigned to
William Fitch at South Omaha under the name and style
of William Fitch & Co.    The facts essential to an under-
standing of the questions involved are as follows:

On the 20th day of June, 1888, the First National Bank
of St. Paul, Nebraska, of which the appellant was presi-
dent, addressed to the appellee the following communica-
tion:

"St. Paul, Neb., June 20, 1888.

" *H. C. Bostwick, Cash., So. Omaha*—Sir: Will you
give me, in confidence, what information you may have re-
garding financial standing and responsibility of Wm. Fitch
& Co., commission firm.    We are sending you a good
many drafts on them and would like to know something
of them, and would consider it a special favor if at any
time you consider them at all shaky, you would notify us,
and we will be glad to reciprocate at any time.

"Yours truly,              Geo. E. Lean,
                                         "*Cashier.*"

To the above, appellee replied, under date of June 21, as follows:

"DEAR SIR: Replying to yours of 6/20, Wm. Fitch is doing a small commission business under name of Wm. Fitch & Co. We have been doing business with him a long time and think him reliable and conservative. I think he has about $2,000 in his business, which is as much cash capital as larger firms use. We do not think him in any way shaky, and will inform you if we have reason to change our opinion.        H. C. BOSTWICK,

"*Cashier.*"

Fitch was, as may be inferred, at the date mentioned, engaged in the live stock commission business at South Omaha, and in which he continued up to and subsequent to the transactions out of which this controversy arose. On the 24th day of September, 1888, appellant, at Dannebrog, in this state, shipped a car load of hogs to South Omaha, consigned to Fitch in the name of Wm. Fitch & Co. Said hogs were in due time received by the consignee named, who, on the 26th day of September, sold them to the Armour-Cudahy Packing Company for the sum of $1,021.80. In accordance with the established practice, weight tickets were issued bearing the indorsement of the purchaser, directing payment of the amount of such purchase, which were by Fitch turned over to and collected by the appellee bank, the proceeds thereof being placed to the credit of the former on an open account, and which was, as will presently appear, then largely overdrawn. The plaintiff on September 25 drew upon Fitch & Co. for $1,000, the estimated net proceeds of the shipment above mentioned, but which draft the appellee, by whom it was presented for payment, on September 27, returned unpaid, bearing the indorsement "amount not correct." It is conceded that the proceeds of the hogs sold, less necessary charges, including commission, amounted to the sum of $976.01, and for which the appellant on the 28th day of September drew

upon Fitch & Co.  The draft last mentioned was sent for collection to the appellee, and upon presentation payment thereof was refused.  Fitch, according to the representative of the appellee bank, assigned as a reason for his refusal that the hogs in question had been purchased with money advanced by him for that purpose to one Stuart, and shipped in appellant's name in order to defraud him of the amount of his advancement, although that contention has no support whatever in the record.

Fitch's account with the bank shows a general balance in his favor until about August 10, 1888.  Beginning with August 13, his account was overdrawn in various amounts, until the close of business September 25, when his indebtedness to the bank on his open account was $976.44. During the month of August he was, according to the record, overdrawn fourteen days, in the average sum of $591.01, the highest amount thereof being $747.23 on the 4th and the lowest $355.22 on the 22d.  From September 1st to 25th, inclusive of both days he was overdrawn twenty days, in the average sum of $1,276.69, the highest being $1,757.94 on the 10th and the lowest $585.54 on the 18th.  The transactions on the 26th were the payment of two checks for $5 each, drawn by Fitch, making a total on the debit side of $986.44 and a credit for $1,021.80, the proceeds of plaintiff's hogs, leaving a balance in his favor at the close of business on that day of $35.36.  Fitch was, it seems within the knowledge of the appellee, in the habit of making advancements to shippers and reimbursing himself from the proceeds of stock subsequently consigned to him, although it was aware that most, if not all, of his deposits represented the proceeds of stock sold on commission and for which he was accountable to consignors.  It is also a reasonable inference from the admitted facts that appellee was advised not later than September 27, on which day the first mentioned draft was presented by it, that Fitch's credit of the preceding day was the pro-

ceeds of stock sold for the appellant, and it is shown to have been fully informed of his rights in the premises on the 2d day of October following. As one of the questions presented involves an examination of Fitch's account with the bank from September 26 to October 2, inclusive, a summary thereof is here given:

| Wm. Fitch & Co. | Dr. | Cr. |
|---|---|---|
| Sept. 26. Balance ...................... | | $35 36 |
| " 27. Deposit ...................... | | 958 75 |
| " 28. Check ...................... | $917 20 | $994 11 |
| " " " ...................... | 40 00 | |
| " " " ...................... | 5 00 | |
| " 29. Int. on Sept. overdraft... | 10 50 | |
| Oct. 1. Check ........................... | 5 00 | |
| | $977 70 | |
| Oct. 2. Balance...................................... | | $16 41 |

The questions suggested by the foregoing statement will be examined in the following order, viz.: (1.) To what extent, if at all, did the deposit of the appellant's money and its application in discharge of Fitch's indebtedness to the bank affect the rights of the former? (2.) Are the rights of the parties affected by the transactions between Fitch and the bank subsequent to September 26 and prior to the receipt of formal notice of the appellant's rights on the 2d day of October?

Preliminary to the first inquiry it should be remarked that the record presents no question of the authority of a factor or broker to deposit, in his own name, money, the proceeds of goods consigned for sale on account of his principal. We assume, therefore, that the act of Fitch, in depositing to his own credit the money realized from the sale of appellant's hogs, was authorized by the course of dealing between the parties named or by the recognized usage of trade,—in short, that such transaction did not in

law amount to conversion by Fitch of the funds in ques-
tion.    It is a recognized rule in equity jurisprudence that
trust funds may be followed through any number of trans-
mutations and reclaimed by the owner so long as they can
be distinguished in the hands of the trustee or his assigns.

In the leading case of *Pennell v. Deffell*, 4 De G., M. &
G. [Eng.], 372, the controversy was between an official as-
signee in bankruptcy and the executors of a prior deceased
assignee who had kept a bank account in which he had
mingled his own funds with those of the trust, the credits
being all entered in his own name.    It was said: "When
a trustee pays trust money into a bank to his credit, the
account being a simple account with himself, not marked
or distinguished in any other manner, the debt thus con-
stituted from the bank to him is one which, as long as it
remains due, belongs specifically to the trust as much and
as effectually as the money so paid would have done had
it specifically been placed by the trustee in a particular re-
pository and so remained; that is to say, if the specific
debt shall be claimed on behalf of the *cestuis que trustent*
*   *   *   as between the trustee and his executors and the
general creditors after his death."

In *Van Alen v. American Nat. Bank*, 52 N. Y., 1, it was
held that where an agent deposits in bank to his own ac-
count the money of his principal under the direction of the
latter, such fund is impressed with a trust in favor of the
owner which is not affected by the fact that the agent at the
same time deposited to the same account funds of his own.
Referring to the question of notice by the bank of the
plaintiff's rights, the chief justice says: "It was suggested
on the argument that notice to the bank by the depositor
was necessary to protect the rights of the plaintiff, but this
is not so.    The title of the plaintiff does not depend upon
whether the bank knew he had title or not.    That rests
upon other facts.    A notice to the bank might have pre-
vented any transfer, or the creation of a lien by the de-

positor, or prevented the bank from taking or acquiring such lien in good faith, but could not otherwise be necessary or important."

In *Burtnett v. First Nat. Bank of Corunna,* 38 Mich., 630, one Raynale deposited with the defendant bank to his own account the sum of $1,015, the proceeds of certain securities belonging to the plaintiff's intestate. Of the amount so deposited, he subsequently checked out $229.29 and soon thereafter died insolvent, being indebted to the bank in a sum exceeding the balance shown by the books thereof in his favor. Thereupon the bank, claiming the right to apply said balance upon Raynale's indebtedness, made upon its books the entries necessary to effectuate that result. In the opinion of the court, reversing the judgment below for the defendant, Graves, J., says: "But we are not aware of any principle which will enable a depositary, who has received from a trustee or agent a fund·belonging in fact to the principal or beneficiary, to appropriate it by his sole act to his own debt held against the trustee or agent, and thereupon to insist that his want of knowledge of the true ownership is sufficient to guard such inequitable appropriation and bar the·real owner from pursuing the fund."

In the recent case of *Davis v. Panhandle Nat. Bank,* 29 S. W. Rep. [Tex.], 926, the facts were quite similar to those involved in this controversy. There one Hancock, having in his possession a sum of money, the proceeds of certain live stock sold for the plaintiff, deposited it to his own credit with the defendant bank, with which his account was then overdrawn. In holding that the plaintiff was entitled to recover for so much of the deposit as was applied to balance Hancock's account the court say : "There is neither allegation nor evidence that the bank lost its debt upon Hancock by reason of this transaction, * * * and in the absence of such evidence we do not see upon what principle it should be allowed to retain this money."

The court in the case last cited say further: "As to whether or not it [the bank] should be protected in the amount it allowed Hancock to check out after its receipt, will depend upon the question of notice. If it had notice of the real ownership of the funds, and that Hancock was not authorized to use them at the time it honored his checks, it should be required to pay appellant notwithstanding such payments. If, however, it did not have notice of these facts, the money having been remitted to it in the name of Hancock, Davis should bear the loss."

In Boone, Law of Banking, sec. 285, the subject is considered in all of its phases, and concludes as follows: "It may be stated as a general principle, that if money deposited in a bank was held by the depositor in a fiduciary capacity, its character is not changed by being placed to his credit in his bank account." And the same principle is recognized in the following cases: *Third Nat. Bank of St. Paul v. Stillwater Gas Co.*, 36 Minn., 75; *Peak v. Ellicott*, 30 Kan., 156; *Baker v. New York Nat. Exchange Bank*, 100 N. Y., 31; *Whitley v. Foy*, 6 Jones Eq. [N. Car.], 34; *Central Nat. Bank v. Connecticut Mutual Life Ins. Co.*, 104 U. S., 54; *Union Stock Yards Bank v. Gillespie*, 137 U. S., 411.

Analogous in principle, also, is the doctrine, abundantly supported by authority, that a partner cannot, without the consent of his copartners, apply the firm property in satisfaction of his individual liabilities, and that upon one so receiving partnership property is cast the burden of proving either consent by the other partners, or facts which amount to an equitable estoppel as against them. (*Kendal v. Wood*, 6 L. R., Ex. [Eng.], 243; *Heilbut v. Nevill*, 4 L. R., C. P. [Eng.], 354; *Rogers v. Batchelor*, 12 Pet. [U. S.], 221; *Davis v. Smith*, 27 Minn., 390; *Farwell v. St. Paul Trust Co.*, 45 Minn., 495; *Johnson v. McClary*, 131 Ind., 105. See, also, Parsons, Partnership, sec. 90, and note; Bates, Partnership, sec. 1046; *Dob v. Halsey*,

16 Johns. [N. Y.], 34; *Mutual Nat. Bank v. Richardson*, 33 La. Ann., 1312.)

A consideration of the authorities cited leads irresistibly to the conclusion that appellant's right to the money in controversy was not affected by the deposit thereof in Fitch's name, and that he is entitled to reclaim it notwithstanding that fact, unless there exists in favor of the bank an equitable defense arising out of the subsequent transactions, which should prevail as against his title, a question we will now proceed to examine.

The allegations of the petition are indicated by the foregoing statement of facts, while the answer is, in effect, a general denial. It may, for the purpose of the present inquiry, be conceded that payment by the bank of the money in controversy upon Fitch's checks, in good faith, relying upon his apparent title thereto, without notice of appellant's rights in the premises, would be a complete justification,—in short, that appellant, having clothed Fitch with the apparent ownership of said fund, is now estopped as against the bank to question his authority to check it out. But is that fact available as a defense under the issues presented? "The answer shall contain (1) a general or specific denial of each material allegation of the petition controverted by the defendant; (2) a statement of any new matter constituting a defense, counter-claim, or set-off, in ordinary and concise language." (Civil Code, sec. 99.) It has, in construing the section quoted, been repeatedly held that new matter of any kind, constituting a complete or partial defense, must be specially pleaded. (*Atchison & N. R. Co. v. Washburn*, 5 Neb., 117; *Burlington & M. R. R. Co. v. Harris*, 8 Neb., 140; *Clark v. Mullen*, 16 Neb., 481; *Mordhorst v. Nebraska Telephone Co.*, 28 Neb., 610; *Bishop v. Stevens*, 31 Neb., 786; *Prall v. Peters*, 32 Neb., 832.) New matter, according to the most approved interpretation of the term, is any fact extrinsic to the matter alleged as the cause of action, and includes all defenses, whether legal or equi-

table, not included in a denial of the allegations of the petition. (Bliss, Code Pleading, sec. 352.) And the rule thus stated is applicable to the case at bar, however the transaction in question may be characterized, whether as an estoppel *in pais,* or simply as a repayment of the appellant's money upon the checks of his authorized agent. It follows from these views that decree for the defendant must be reversed and the district court advised to enter a decree in accordance with the prayer of the petition.

REVERSED.

IRVINE, C., not sitting.