MATY A. SMITH V. DES MOINES NATIONAL BANK, Appellant.

**Trusts.** A trust arises as to money received without authority or even wrongfully, as between the person receiving it and the true owner.

**Trust Fund: NOTICE.** Trust funds deposited with a bank were applied on a matured note of the depositor. An officer of the depositor testified that before making the deposit, he told the bank's president that the company was collecting money for many people, and must not be placed in the attitude of paying its debts with the money of others, specifically mentioning a certain transaction which he wished to protect. The bank's president testified that he knew that a part of the company's deposit belonged to others, but that he had no knowledge that any of it except such part was not the company's money, nor did he know that any of it belonged to plaintiff. *Held,* that the bank had no notice that plaintiff had any interest in the funds applied on the note.

**SAME.** A *cestui que* trust cannot recover trust moneys which were deposited in a bank by the trustee in his own name and which, without notice of their trust character the bank applied to a matured individual note of the trustee, surrendering the note to the latter.

**Pleading and Practice: RATIFICATION.** Ratification of the act of an alleged agent is equivelent to prior authority and need not be specially pleaded.

*Appeal from Polk District Court.*—HON. W. F. CONRAD, Judge.

WEDNESDAY, FEBRUARY 8, 1899.

SUIT in equity to establish a trust upon certain funds in the hands of the defendant, and for judgment for the amount of plaintiff's claim. The answer was, in effect, a general denial. Trial to the court, decree for plaintiff as prayed, and defendant appeals.—*Reversed.*

*Chas. L. Powell* for appellant.

*C. C. Cole* for appellee.

DEEMER, J.—The Lewis Investment Company was a corporation organized under the laws of this state, for the purpose of making loans from its own funds, as well as for investing and loaning money belonging to others. Its capital stock was one hundred and fifty thousand dollars. It selected the Des Moines National Bank as its banker, and opened an account with it in May of the year 1894. With this bank it did a large business, and its transactions were quite similar to those of the other customers of the bank. Money was borrowed from time to time, and large amounts were deposited in the name of the corporation, which were checked out in the usual course, as needed. All the business with the bank was done in the name of the corporation, with the one exception to be hereinafter noted. In the month of December, 1895, the bank held three notes of the company, one for six thousand dollars, and two for ten thousand dollars each, representing loans made at different times to the investment company. These loans were made in reliance, in part, upon the security afforded by the company's daily balance, which had always been quite large. The six thousand dollar note matured December 5, 1895, and, there being to the credit of the company on that day the sum of six thousand one hundred and eighteen dollars and twenty-one cents, the bank charged the note to the account, canceled the instrument, and delivered it to the investment company on the seventh of December. After this had been done, a check of the investment company for three thousand five hundred and eighteen dollars and five cents was presented, and payment refused for want of funds. The manager of the company then began negotiations with the bank to secure the payment of the check, claiming that it represented money belonging to an insurance company, which must be paid. The bank finally made a new loan to

the company for the sum of three thousand five hundred dollars, which was credited to that company, and the check which had been refused was thereafter paid. The account was closed and balanced on December 11th, by check issued by the investment company for the balance then due, to-wit, one hundred and eighty-seven dollars and thirty-three cents. On the twenty-fourth of December, 1895, the investment company failed, and its business was closed up, with very small returns to its creditors. Plaintiff claims that one thousand six hundred and twenty-three dollars and thirty-three cents of the amount of the investment company deposit which was applied upon the six thousand dollar note belonged to her, was held in trust by the investment company, and received by the bank with knowledge of its trust character, and that she is entitled to recover that amount from the bank.

The evidence shows that the investment company had loaned for plaintiff the sum of one thousand six hundred dollars, and had taken as security therefor a mortgage upon a house and lot in the city of Omaha, Nebraska, and that a policy of fire insurance on the house was assigned to plaintiff as additional security. The house was destroyed by fire, and the insurance company sent to the investment company a draft for one thousand eight hundred and twenty-five dollars and thirty-three cents in payment of the loss. The draft was made payable to the investment company, and, after indorsement by that company, was deposited in the bank, with some other items belonging to the investment company, on the second day of December, 1895, as hereinbefore stated. Lewis, the manager of the investment company, testifies that, before making the deposit, he had a conversation with the president of the bank, in which he told the president that he was collecting money for a great many people, and that his company must not be placed in the attitude of paying its debts with money belonging to others, and spoke especially of a certain five thousand dollar transaction that he wished to

protect. He further says that the president of the bank agreed to renew the six thousand dollar note, which was shortly to mature, and said "that they would not do anything mean, and that I could rely upon the note being renewed." Lewis further says that, on the strength of this agreement, he made deposits aggregating nearly nine thousand dollars, composed of money belonging to others as well as that of the company. He also says that, when he learned of the application of the deposits to the payment of the six thousand dollar note, he very seriously objected, and that the check which the bank refused to pay related to the very item which he had specifically referred to in his conversation with the president of the bank. He further testified that he protested very strongly against the change made in the agreement to renew, and that the president of the bank then said they could not renew, and had applied the funds in the deposit account upon the note. The president of the bank admits having notice that five thousand dollars of the deposit of December 2d belonged, in part at least, to an insurance company, and that he agreed to protect the investment company's check which was then outstanding, which he did on the next day. He further says that the check which was refused was one issued by the company, and that he had not agreed to pay or protect it. He further says that he had no notice of any kind that any of the money deposited by the investment company, except the five thousand dollars, belonged to others, and specially denies that he had any notice of any kind that any part of it belonged to plaintiff. Further, he said that the bank refused to renew the six thousand dollar note unless the investment company would give further security, and that, as the investment company was unable to furnish this security, no agreement for renewal was ever consummated, and that the bank applied sufficient of the deposit account to liquidate the note without knowledge that any part of it belonged to plaintiff or any person other than the investment company.

As the burden is upon appellee to show notice to the bank of her interest in the funds deposited by the investment company, and as the evidence as to notice consists in a loose and rather unsatisfactory statement made by the manager of the company, which is flatly denied by the president of the bank, we are constrained to believe there was no notice of the character of these funds. Whether such notice is essential to plaintiff's recovery, we will hereafter determine.

Appellant contends that the investment company had no authority to receive the money due plaintiff from the insurance company, and was not her agent either for the collection of the note and mortgage upon the Omaha property or the insurance money due upon the house. It is doubtless true that the investment company had no authority to collect either the note and mortgage or the sum due on the policy of insurance, and it is not claimed that it had any such authority. The claim is that the plaintiff's money was sent to the investment company, and was by it deposited in the bank, with knowledge that it belonged to plaintiff. Proof of the investment company's agency to receive the money is not essential to the establishment of a trust. If it received the money without authority, or even wrongfully, a trust arose as between it and the true owner of the money; for it is a general rule that any one wrongfully possessed of an estate becomes a trustee *ex maleficio,* and is answerable to the party injured as *cestui que* trust. 2 Pomeroy Equity Jurisprudence, section 1047. Moreover, if proof of agency were needed to establish a trust, the evidence adduced is sufficient to show ratification by plaintiff of the conduct of the investment company in receiving the insurance money. Such ratification is equivalent to prior authority, and need not be specially pleaded. *Long v. Osborn,* 91 Iowa, 160.

The money received by the investment company was impressed with a trust in favor of plaintiff to the extent of her note and mortgage against the Omaha property, and the

only question which remains is, is she entitled to have a trust declared upon that amount of the 'money deposited by the Lewis Investment Company, in the absence of notice to them of the character of the money received? Had the bank received it in good faith and for value, there is no doubt that it would not be responsible to the plaintiff. *Stephens v. Board,* 79 N. Y. 183; *Dillaye v. Bank,* 51 N. Y. 345; *Trull v. Bigelow,* 16 Mass. 406; *Peebles v. Reading,* 8 Serg. & R. 484. But may, a bank, having no notice of the trust character of the funds it receives, apply them upon a note of the depositor which is due at the time the application is made, and escape responsibility to the *cestui que* trust? This is the pivotal inquiry in the case, and we find, in looking into the decided cases, that they are in apparent conflict upon this proposition. If the bank had simply received the money as an ordinary deposit, and had not applied it upon the debt due from its depositor, there is no doubt that the person for whom the depositor held the money could follow it. *National Bank v. Insurance Co.,* 104 U. S. 54; *Bank v. Peters,* 123 N. Y. 272 (25 N. E. Rep. 319); *Bank v. King,* 57 Pa. St. 202; *Van Alen v. Bank,* 52 N. Y. 1. Is the rule different when the bank applies the money in payment of the note of its depositor and surrenders the note to him? The cases of *Burtnett v. Bank,* 38 Mich, 630, and *Cady v. Bank,* 46 Neb. 756 (65 N. W. Rep. 906), both seem to hold that a *cestui que trust* may follow money deposited by the trustee in a bank to which he (the trustee) is then indebted, and hold it free from any lien of the bank, although the bank had no notice of the trust character of the money at the time it received it. These cases are each distinguishable, however, from the one before us. In the *Burtnett Case* there was no evidence whatever that the trustee participated in, or assented to, the appropriation made by the bank and Graves, J., in writing the opinion, said that if he had done so, and the bank had made the appropriation without notice of the trust character of the fund, there might be room for

other considerations. Now, while Lewis, the manager of the investment company, at first objected to the appropriation of the money, yet, when he afterwards made the loan of three thousand five hundred dollars, he agreed and consented to the appropriation as made, and at this time the bank had no notice that plaintiff had any interest in the funds. Again, in neither of the cases cited did it appear that the bank had canceled and surrendered the obligation of its depositor. In the *Cady Case* the bank interposed a general denial, and the court held that such denial did not raise the question of estoppel. It is expressly said in that opinion that, if the bank had paid out the money on checks of the depositor, relying upon his apparent title thereto, and having no notice of the trust character of the funds, such payment would be a complete justification. The case of *Hutchinson v. Manhattan Co.* (Super. N. Y.), 29 N. Y. Supp. 1103, sometimes relied upon in support of appellee's contention, was reversed by the court of appeals. See 44 N. E. Rep. 775. Opposed to what seems to be the holding in the two cases cited, we find a number of authorities sustaining this statement found in Prof. Pomeroy's Equity Jurisprudence (section 1048), as follows: "If a trustee or other fiduciary person, in violation of his duty, uses trust money to pay an antecedent debt of his own to a creditor, who has no notice of the breach of trust, or that the money is subject to the trust, · in such a manner that the money is received as a general payment, and not as a distinct and separate fund, then the money becomes free from the trust, and cannot be followed by the beneficiary into the hands of the creditor, although, in general, an antecedent debt does not constitute a valuable consideration." Thus, in *Stephens v. Board,* 79 N. Y. 183, it is said: "The rule has been settled by a long line of cases that money obtained by fraud or felony cannot be followed by the true owner into the hands of one who has received it *bona fide* and for a valuable consideration, in due course of business. Thus, said Lord Holt, in 1 Salk. 126, 'by reason of the course of trade, which

creates a property in the assignee or bearer.'" And in *Miller
v. Race,* 4 Burrows, 452, Lord Mansfield said: "The true
reason is upon account of the currency of it. It cannot be
recovered after it has passed into currency." Then, speaking
to the point made in that case, as in this one, that an ante-
cedent debt is not such a consideration as would cut off the
equities of Stephens, the court said: "But no case has been
referred to where the rule has been applied to money received
in good faith in payment of a debt. It is absolutely neces-
sary, for practical business transactions, that the payee of
money, in due course of business, shall not be put upon
inquiry, at his peril, as to the title of the payor. Money has
no earmark. It is generally impracticable to trace the source
from which the possessor of money has derived it. It would
introduce great confusion into commercial dealings if the
creditor who receives money in payment of a debt is subject
to the risk of accounting therefor to a third person, who may
be able to show that the debtor obtained it from him by fel-
ony or fraud. The law wisely, from consideration of public
policy and convenience, and to give security and certainty to
business transactions, adjudges that the possession of money
vests the title in the holder as to third persons dealing with
him, and receiving it in due course of business and in good
faith, upon a valid consideration. If the consideration is good
as between the parties, it is good as to all the world. 'Money,'
said Lord Mansfield, in *Miller v. Race,* before cited, 'shall
never be followed in the hands of a person who, *bona fide,*
took it in the course of currency and in the way of business.'"
So, in *Wood v. Bank,* 129 Mass. 358, we find this language:
"It is contended that there is nothing in these facts which
shows that Jackson pledged, or intended to pledge, this note
as security for his debt to the bank, or do more than give it
to the bank to collect as agent for the plaintiff; but the effect
of the transaction, as between Jackson and the bank, is to be
determined by the application of well settled legal principles.
Jackson was the ostensible owner of the note. He delivered

it to the bank in the usual course of business, with no notice, express or to be implied, that it was sent for collection only, or that any one else had any interest in it. No instructions as to the application of the proceeds were given. He knew that, in the regular course of business, it would be credited to his general account, to be availed of in that way as security to the bank. It has long been settled that a banker who has advanced money to another has a general lien on all securities of the latter which are in his hands for the amount of his general balance, unless such securities were delivered to him under a particular agreement limiting their application. The unknown owner of the note, who gave it to Jackson with all the appearance of title in him, cannot be permitted to defeat the right of the bank, who, long before it had knowledge of the claim had applied the same to the payment of Jackson's debt." This same court, in the case of *School Dist. of Greenfield v. First Nat. Bank.* 102 Mass. 174, speaking to the same point, said: "A trustee who deposits in a bank and causes to be credited to his private account, money of a trust fund, without giving any notice that it is not his private property, or making any special agreement in regard to it, thereby converts it to his own use, so that the bank, in the absence of any notice that it is not his private property, may apply it as such." In *Hatch v. Bank,* 147 N. Y. 184 (41 N. E. Rep. 403), the supreme court of New York had the question before it, and during the course of its opinion said: "If Mills, Robeson & Smith, on receiving the check of Ferris (to whom the collateral was sold), had at once collected it, and turned it into money, and then had paid that money to the bank in discharge of their debt to it, and the bank had accepted that payment in ignorance of the source from which the money had been derived, and had surrendered the notes and discharged their debtors' liability in good faith, the owner of the stolen money would have had no right of recovery as against the bank (citing *Justh v. Bank,* 56 N. Y. 478; *Stephens v. Board,* 79 N. Y. 183. This doctrine goes upon the ground that money has

no ear mark; that, in general, it cannot be identified as chattels may be; and that to permit, in every case of a payment of a debt, an inquiry as to the source from which the debtor derived the money, and a recovery if shown to have been dishonestly acquired, would disorganize all business operations, and entail an amount of risk and uncertainty which no enterprise could bear.    The rule is founded upon a sound general policy, as well as upon that principle of justice which determines, as between innocent parties, upon whom the loss should fall under the existing circumstances.    If, therefore, Smith had come with the money, and with it had paid his debt over the counter, the amount could not have been recovered by the plaintiff, although admitted to have been the actual proceeds of the stolen certificate.    I think the situation was not at all changed because the debtor came with Ferris & Kimball's check, which the bank collected, nor does it change the result that Smith deposited the check, and did not at the moment direct its application upon the liability of the firm."

Had the bank in this case simply relied upon its lien on the deposit, or had it treated it simply as security for the note of the investment company, which was a prior and antecedent debt, it may be that it should not be treated as a *bona fide* holder of the deposit.    But the evidence shows that it canceled and surrendered the note with the final assent of the investment company, and without notice of plaintiff's rights.    In the case of *Burnett v. Gustafson,* 54 Iowa, 86, in speaking of somewhat similar transactions, we said:    "Whatever may be regarded as the proper rule respecting the transfer of other property in payment of existing debts, it cannot be denied that the receipt of money in that manner is in the usual course of business.    A want of *bona fides* cannot be attributed to the party who surrenders the evidence of an existing debt in consideration of money paid."    Looking yet further into our own decisions regarding the matters here at issue, and we find that in the case of *Long v. Emsley,* 57

Iowa, 12, we had this question: "When a township clerk has received public money of the township in his capacity of clerk, and has deposited the money with the bank in his individual name, as a general deposit, without disclosing the fact that the money was a public fund, and without adding or mixing it with his own individual money, does the money, in law, as to third parties without notice, remain a public fund, or has it become the individual property of the township clerk?" In answer to that we said: "We think the money becomes the individual property of the person making the deposits,"—citing the case reported in 102 Mass. Again, in the case of *Smith v. Bank*, 99 Iowa, 282, we had almost the identical question here presented, and we there said "that, even if the trust relation was shown * * * it was not shown that defendant had notice of it, or facts from which it could be said, under the circumstances, that it should be held to have been put upon inquiry to ascertain the existence of such a relation;" and we held that, in view of this fact, plaintiff, the beneficiary, could not recover. Now, while we have been quite liberal with the so-called "modern trust-fund doctrine," and have allowed the *cestui que* trust to follow his property into the hands of receivers, assignees, etc., without compelling him to indentify the particular money received (*Plow Co. v. Lamp*, 80 Iowa, 722, and *Independent Dist. v. King*, 80 Iowa, 497), yet we have never so extended the doctrine as to work a hardship to *bona fide* purchasers for value or those who stood in a similar situation; and we do not think a doctrine fraught with so much hardship to the commercial world as that relied upon by appellee should be announced. While plaintiff might have established a trust upon the property in the hands of the bank, if it had not applied the deposit in payment of the debt of the ostensible owner, yet, as it had so applied the money, with the consent of the investment company, and without knowledge of plaintiff's rights, we do not think she is entitled to recover. In addition to the author-

ities already cited, we call attention to the following cases, which support the rule announced: *Newton v. Porter,* 69 N. Y. 133; *Dotterer v. Pike,* 60 Ga. 29; *Dey v. Dey,* 26 N. J. Eq. 182; *Mercier v. Hemme,* 50 Cal. 606; *National Bank v. Insurance Co.* 104 U. S. 54; *Swift v. Williams,* 68 Md. 236 (11 Atl. Rep. 835); *Lee v. Lee,* 67 Ala. 406. The decree of the district court is REVERSED.