**CLAYTON BROKERAGE CO. OF ST. LOUIS, INC., Plaintiff-Appellant,**

v.

**R. D. LOWRANCE,**
**Defendant-Respondent.**

**No. KCD 30014.**

Missouri Court of Appeals,
Western District.

Dec. 3, 1979.

Motion for Rehearing and/or Transfer
Denied Dec. 31, 1979.

Application to Transfer Denied
Feb. 11, 1980.

---

Thompson & Mitchell, David Wells, James W. Erwin, St. Louis, James G. Spencer, Milan, for plaintiff-appellant.

Strong, Strong & Prokes, Frank H. Strong, Roger M. Prokes, Maryville, Robert F. Devoy, Brookfield, for defendant-respondent.

Before SOMERVILLE, P. J., and PRITCHARD and MANFORD, JJ.

SOMERVILLE, Presiding Judge.

Clayton Brokerage Co. of St. Louis, Inc. (Clayton) brought suit against R. D. Lowrance (Lowrance) seeking judgment in the amount of $95,225.00. Trial by jury resulted in a verdict in favor of Clayton and against Lowrance for $11,225.00 and Clayton appealed from the judgment entered thereon.

The "points relied on" by Clayton on appeal, three in number, branch into widely diverse areas. Substantially paraphrased, the "points relied on" are: (1) Error on the part of the trial court in permitting Lowrance, at the close of all the evidence, to amend his answer and "plead the affirmative defense of detrimental reliance"; (2) Error on the part of the trial court in giving Instruction No. 6 (requested by Lowrance) because it omitted an essential element of the "affirmative defense of detrimental reliance", namely, that Lowrance "did not know nor could not have known in exercise of reasonable care of the error made by [Clayton] in paying the $84,-000.00"; and (3) Error on the part of the trial court in overruling Clayton's after trial motion to set aside the verdict and judgment entered thereon and to enter judgment in its favor and against Lowrance in the sum and amount of $95,225.00 in accordance with its motion for a directed verdict made at the close of all the evidence.

A veil of confusion, largely attributable to a near fatal case of pleading anemia and a failure to decisively come to grips with some rather novel legal propositions, settled over this case at the trial level and to a marked degree still persists in the minds of the parties on appeal. In order to lift this

veil of confusion and judicially cope with the three points relied on by Clayton on appeal this court feels constrained to engage in a protracted review of the pleadings, the evidence, and certain procedural events.

Clayton's cause of action against Lowrance, as garnered from its petition, was predicated on the following allegations: (1) Clayton, a Missouri corporation, was engaged in the business of acting as a broker for its customers in the purchase and sale of contracts for the future delivery of various commodities; (2) Ray W. Olson, a resident of Sullivan County, Missouri, employed Clayton, per a written agreement, to act as his broker "in the purchase and sale of contracts for the future delivery of commodities on his account"; (3) Lowrance, a resident of Nodaway County, Missouri, likewise employed Clayton, per a written agreement, to act as his broker "in the purchase and sale of contracts for the future delivery of commodities on his account"; (4) On or about December 5, 1975, Olson delivered a check to Clayton drawn on the Citizens Bank of Newtown, Missouri, in the amount of $129,000.00, with Olson as the maker and Clayton as the payee, accompanied by instructions from Olson to Clayton to credit $96,000.00 to Lowrance's commodity account (No. 47017) and $33,000.00 to Olson's commodity account (No. 46978), which instructions Clayton complied with; (5) On or about December 9, 1975, pursuant to instructions from Olson, Clayton "wired" $84,000.00 for deposit in a checking account in Lowrance's name at the Citizens Bank of Newtown, Missouri; (6) On or about December 15, 1975, Clayton received notice that Olson had stopped payment on the $129,000.00 check; (7) After receiving notice that Olson had stopped payment on the $129,000.00 check, Clayton caused Lowrance's "long positions" with Clayton to be closed pursuant to the terms of Lowrance's written agreement with Clayton, thereby leaving a "deficit balance" of $95,225.00 owed by Lowrance to Clayton on Lowrance's commodity account No. 47017 with Clayton; (8) Lowrance, under the terms of his written agreement with Clayton, was obligated to pay any "deficit balance" owed to Clayton in connection with said commodity account and to pay interest thereon at the rate of eight percent (8%) per annum; (9) Clayton made a demand upon Lowrance for payment of the "deficit balance" in the amount of $95,-225.00, but Lowrance refused to pay said amount; and (10) Clayton prayed for judgment against Lowrance "in the sum of Ninety-five Thousand Two Hundred Twenty-five and no/100 Dollars ($95,225.00) with interest at the rate of Eight percent (8%) and its costs incurred herein".

By way of answering Clayton's petition, Lowrance admitted that he was a resident of Nodaway County and that Olson was a resident of Sullivan County; admitted that Clayton made a demand upon him for payment of the amount of $95,225.00 and that he refused to pay said amount; denied that he owed Clayton a "deficit balance" of $95,-225.00; denied that he was obligated to pay interest at the rate of eight percent (8%) per annum on the alleged "deficit balance"; alleged that he was without sufficient information, knowledge or belief to form an opinion as to the truth or falsity of all other allegations in Clayton's petition and therefore denied the same; affirmatively pleaded that if Clayton "wired" $84,000.00 to the Citizens Bank of Newtown, Missouri, for deposit to his account, said bank failed to credit said funds to his account and failed to transmit said funds to him; affirmatively pleaded that he did not authorize or instruct either Clayton or Olson to wire any funds to the Citizens Bank of Newtown for deposit to his account and if Clayton did so it was without his knowledge or consent and constituted a "negligent act" on Clayton's part for which Lowrance was in no way liable or responsible; affirmatively pleaded that he had no knowledge of the $129,000.00 check referred to in Clayton's petition and that he never authorized Olson or anyone else to stop payment on said check; and affirmatively pleaded that he was not indebted to Clayton.

The case started to trial before a jury in Sullivan County, Missouri, on the issues

joined by Clayton's petition and Lowrance's answer thereto as summarized above. It was patent from the face of Clayton's petition that damages for breach of an express contract was the legal theory upon which it sought recovery of $95,225.00 from Lowrance, and, likewise, patent from the face of Lowrance's answer, that "detrimental reliance" was neither envisioned at the time nor pleaded as an affirmative defense. Bear in mind, however, that by the time the case was submitted to the jury Clayton's legal theory of recovery and Lowrance's defense thereto had both undergone a metamorphosis which left the legal theories drawn by the formal pleadings upon which the case started to trial virtually unrecognizable.

A compilation of the evidence placed before the jury by witnesses called and exhibits offered by Clayton is next in order.

Clayton, a Missouri corporation, whose principal office was located in St. Louis, Missouri, acted as a broker on behalf of various customers for the purchase and sale of contracts for the future delivery of commodities. Lowrance traded primarily in cattle and hog future contracts with Clayton. An instrument in writing, denominated "Customer's Agreement", was entered into between Clayton and its respective customers, including Lowrance and Ray W. Olson (Olson). Among other things, the "Customer's Agreement" provided that "debit balances" in a customer's account would be "charged with interest, in accordance with . . . [Clayton's] usual custom, and with any increases in rates caused by money market provisions." Transactions on behalf of Lowrance were handled in a separate commodity account identified as No. 47017 and transactions on behalf of Olson were handled in a separate commodity account identified as No. 46978.

What was denominated a "customer's confirmation slip" was mailed by Clayton to each of its customers on the morning following each day during which transactions occurred in a customer's commodity account. A "customer's confirmation slip" was mailed to Lowrance on the morning of December 6, 1975, showing entry of a credit on December 5, 1975, in Lowrance's commodity account No. 47017 in the amount of $96,000.00 which, together with a credit balance which was carried forward, showed an overall credit balance of $97,565.00 in Lowrance's commodity account as of December 5, 1975. The "customer's confirmation slip" did not show the source of the $96,000.00 credit. The source of the $96,000.00 credit in favor of Lowrance turned out to be a check delivered by Olson to Clayton dated December 5, 1975, in the amount of $129,-000.00 drawn on the Citizen's Bank of Newtown, with Olson as the maker and Clayton as the payee. Olson delivered the $129,-000.00 check to Clayton with instructions to Clayton to credit $96,000.00 to Lowrance's commodity account No. 47017 and to credit $33,000.00 to Olson's commodity account No. 46978. Clayton complied with Olson's instructions. On the date Clayton credited $96,000.00 to Lowrance's commodity account No. 47017 Olson's $129,000.00 check had never been deposited or presented for payment.

A "customer's confirmation slip" was mailed to Lowrance on the morning of December 9, 1975, showing a credit balance of $84,775.00 in Lowrance's commodity account No. 47017 after making adjustments for certain intervening trade transactions.

A "customer's confirmation slip" was mailed to Lowrance on the morning of December 10, 1975, listing a "withdrawal" of $84,000.00 from Lowrance's commodity account No. 47017 on December 9, 1975, and a closing credit balance of $775.00 as of December 9, 1975. The $84,000.00 "withdrawal" entry was accounted for by reason that Clayton, on instruction from Olson, "wired" $84,000.00 on December 9, 1975, to the Citizens Bank of Newtown, Missouri, for deposit in a checking account which had been opened in Lowrance's name. This checking account, although in Lowrance's name, had been opened by Olson. When Clayton wired the $84,000.00 to the Bank of Newtown for deposit in an account standing in Lowrance's name the $129,000.00

check which Olson delivered to Clayton on December 5, 1975, had not been honored for payment. According to an employee of the Citizens Bank of Newtown a copy of the "bank statement" dated December 17, 1975, reflecting the $84,000.00 deposit, was mailed to Lowrance.

The $129,000.00 check dated December 5, 1975, drawn on Olson's account at the Citizens Bank of Newtown, wherein Olson was maker and Clayton was payee, was presented for payment at the Citizens Bank of Newtown on December 9, 1975. However, it was not honored by the Citizens Bank of Newtown because of a stop payment order placed against it by Olson. The $129,000.00 check, tagged "stop payment", was attached to a "return items" letter and placed in channels for return to Clayton's bank, the First National Bank of Clayton, Clayton, Missouri.

A "customer's confirmation slip" was mailed to Lowrance on the morning of December 16, 1975, showing a "debit" entry of $96,000.00 on December 15, 1975, in Lowrance's commodity account No. 47017 opposite the notation "cust stpd pmt", and a closing "debit" balance of $95,225.00 after making adjustments for certain intervening trade transactions.

On December 19, 1975, the Citizens Bank of Newtown, acting solely on orders from Olson, transferred the $84,000.00 previously credited to a checking account standing in Lowrance's name to Lowrance's regular checking account at the First American Bank in Skidmore, Missouri, where Lowrance customarily banked.

A series of "customer confirmation slips" were mailed to Lowrance on the mornings of December 16, 1975, December 17, 1975, December 18, 1975, December 19, 1975, December 22, 1975, and December 23, 1975, showing a "debit" balance of $95,225.00 in Lowrance's commodity account No. 47017, and containing the following notations opposite said "debit" balance—"Regulated Margin Required—Regulated Adjusted Balance" and "This Amount Required Immediately for Regulated Account".

Because of the "fast moving" nature of Clayton's business it was customary for it to disburse credit on funds represented by customer's checks before such checks were honored for payment.

Clayton also introduced the following admissions of Lowrance which were made in response to Clayton's request for admissions pursuant to Rule 59.01: (1) Lowrance admitted that "On or about December 19, 1975, Ray W. Olson was indebted to the Lowrance Cattle Co. and/or R. D. Lowrance in an amount in excess of $220,000.00, on account of cattle purchased from Lowrance Cattle Co. and/or R. D. Lowrance for the account of Ray W. Olson"; and (2) Lowrance admitted that "On or about December 19, 1975, credit in the amount of $84,000.00 was made toward the outstanding indebtedness of Ray W. Olson to Lowrance Cattle Co. and/or R. D. Lowrance".

Clayton closed its case by introducing the following admissions contained in a deposition taken of Lowrance on July 27, 1976; Olson traded on Lowrance's behalf with Clayton in Lowrance's commodity account No. 47017; Lowrance regularly received "customer confirmation slips" from Clayton regarding commodity account No. 47017; all funds credited to Lowrance's commodity account No. 47017 came from Olson; Lowrance never repaid Olson for funds so credited because of an understanding between Lowrance and Olson that all funds so credited would be credited in like amount in Olson's favor on Olson's indebtedness to Lowrance for the purchase of cattle; Olson's indebtedness to Lowrance for cattle at one time hit a high of "roughly" $240,000; a deposition exhibit marked Clayton's Exhibit 6, identified as a "statement" or "invoice" from Lowrance to Olson dated March 9, 1975, showed, among other things, a "journal entry dated December 19, 1975 . . . indicating that on that day . . . [Olson] paid on account $84,000.00"; and the $84,000.00 payment referred to was made by either a "check or customer draft" drawn on Olson's "account" at the Citizens Bank of Newtown, Missouri.

A compilation of the evidence placed before the jury by witnesses called and exhibits offered by Lowrance is next in order.

The account standing in Lowrance's name at the Citizens Bank of Newtown, Missouri, to which Clayton wired $84,000.00 for deposit, was opened by Olson, a "signature card" was never obtained from Lowrance, and bank personnel never met or talked with Lowrance. Lowrance never requested the Citizens Bank of Newtown to transfer the aforementioned $84,000.00 to Lowrance's account at the First American Bank in Skidmore, Missouri. Any request to do so must have come from Olson.

Lowrance was engaged in the cattle business in 1975 and 1976 as an "order buyer" and counted Olson among his customers. Lowrance identified and offered into evidence an "invoice" dated March 9, 1976, covering transactions in Olson's cattle account with Lowrance between December 19, 1975, and January 22, 1976. Clayton objected to all entries on the exhibit bearing dates subsequent to December 19, 1975, the date Lowrance gave Olson credit on the account in the amount of $84,000.00, on the grounds that they involved transactions "beyond the scope of the pleadings" and injected a defense in the case "never raised in Lowrance's answer". Clayton carefully stated that it had no objection to those portions of the exhibit showing the total amount owed by Olson to Lowrance immediately prior to December 19, 1975, and the credit entry in favor of Olson on December 19, 1975, in the amount of $84,000.00 "because that's already in evidence". Lowrance insisted that all the transactions reflected by its exhibit were admissible because additional cattle were purchased by Lowrance for Olson after December 19, 1975, in reliance upon the $84,000.00 payment credited to Olson's account on December 19, 1975.

In response to Lowrance's statements in support of admissibility of the exhibit and Clayton's objection thereto, the trial court, with refreshing candor, stated: "I admit that I am at a disadvantage here, because I don't understand the theory of the defense, but then neither do I understand the theory of the plaintiff, but I suppose it [Lowrance's exhibit] has some materiality or some relevance or some something to the manner in which the money was handled after it was received. I don't know what the theory of the defense is, frankly, but I don't know the theory of the plaintiff either." Counsel for Clayton responded, but not very helpfully, as follows: "I think it goes specifically to the affirmative defense that Mr. Strong [counsel for Lowrance] may be trying to establish, and I want to make it clear at this point that, as this court well knows, that under Rule 55.08 Mo. Specific [sic] Procedure, Mr. Strong has to set forth any affirmative defenses in his pleadings and he has not done so, and that is exactly what this goes to, and that's why I'm objecting to it." Counsel for Lowrance responded by reoffering the exhibit into evidence, and, notwithstanding Olson's objection, the same was admitted.

The hotly contested exhibit revealed the following: (1) Prior to "12/19" Olson was indebted to Lowrance in the sum and amount of $220,614.08; (2) on "12/19" $84,000.00 was shown "Paid on account", thereby reducing the balance owed to $136,614.08; (3) on "12/26" $100,000.00 was shown "Paid on account", further reducing the balance owed to $36,614.08; (4) on "1/5" an entry of "cattle purchased" in the amount of $16,786.46 was shown; (5) on "1/6" an entry of "cattle purchased" in the amount of $16,383.18 was shown; (6) on "1/12" an entry of "cattle purchased" in the amount of $2,515.46 was shown, and the balance owing was increased to $72,299.18; (7) on "1/15" $18,500.00 was shown "paid on account"; (8) on "1/19" $26,800.00 was shown "paid on account", and the balance owing was reduced to $26,999.18; and (9) on "1/22" a charge of $26,800.00 identified as "returned check" was entered, and the final balance owing was increased to $53,799.18.

Lowrance's order buying was conducted through a bank account maintained at the First American Bank of Skidmore, Missouri. A handwritten deposit slip effecting the deposit made to Lowrance's account at the

First American Bank of Skidmore in the amount of $84,000.00 on December 19, 1975, was offered and admitted into evidence. The handwriting was identified as that of "Mr. Turner", President of the First American Bank of Skidmore. The following handwritten notation, "Olson Newtown", appeared on the deposit slip opposite the figures $84,000.00. This deposit slip was the basis for the $84,000.00 credit which Lowrance gave to Olson on the Lowrance-Olson cattle account.

Although Lowrance never authorized Olson in writing to trade on Lowrance's behalf in Lowrance's commodity account with Clayton, Lowrance knew that Olson was doing so and discussed the trades as they were being made with Olson. When Lowrance received the "customer's confirmation slip" showing a credit deposit of $96,000.00 on December 5, 1975, to Lowrance's commodity account No. 47017 with Clayton, he immediately called Olson and asked him about it. Olson assured Lowrance that it was a mistake in Clayton's office and he (Olson) would straighten it out. When Lowrance received the "customer's confirmation slip" dated December 9, 1975, showing a withdrawal of $84,000.00 from Lowrance's commodity account No. 47017 with Clayton, he again called Olson. Olson again assured him (Lowrance) that Clayton's accounts were all fouled up and that the matter would be straightened out.

Lowrance first learned about the $129,-000.00 check Olson delivered to Clayton from an attorney who called from St. Louis on an unknown date. Prior to this unknown date Lowrance had no knowledge of the Olson check. More particularly, Lowrance had no conversation with Olson concerning such a check. Lowrance never requested or authorized Olson to deposit $96,-000.00 to his commodity account with Clayton, nor did he ever require or authorize Olson or anyone at Clayton's to withdraw $84,000.00 from his (Lowrance's) commodity account with Clayton.

Lowrance never opened a checking account at the Citizens Bank of Newtown and had no knowledge that one had been opened in his name until "all this mess broke loose". Lowrance never authorized Olson to open an account for him at the Citizens Bank of Newtown, and no "bank statements" were ever received by Lowrance from the Citizens Bank of Newtown.

The $84,000.00 deposited to Lowrance's checking account at the First American Bank of Skidmore, documented by the deposit slip containing the handwritten notation "Olson Newtown", was credited by Lowrance as a payment by Olson on Olson's indebtedness with Lowrance. Thereafter, Lowrance purchased additional cattle on Olson's behalf. Lowrance, over Clayton's objection that the subject matter was beyond the scope of the pleadings, was permitted to testify that if the $84,000.00 payment had not been made by Olson he (Lowrance) would not have purchased additional cattle on Olson's behalf.

At the close of all the evidence Clayton filed a written motion for directed verdict which was overruled by the trial court. Immediately thereafter, and before the instructions were settled and the case submitted to the jury, Lowrance requested and was granted leave of court to formally amend his answer and affirmatively plead "detrimental reliance". Clayton objected thereto on the grounds that the issue of "detrimental reliance" had not been tried by the express or implied consent of the parties as evidenced by Clayton's vigorous and persistent objections to any and all evidence appertaining thereto, whether by way of testimony or exhibits. Clayton further objected on the grounds of surprise and prejudice and in connection therewith ostensibly contended that it was precluded from conducting appropriate discovery in connection with the newly injected defense. Nevertheless, and of considerable significance, Clayton did not seek or ask for a continuance.

However amazing it may sound, Clayton's singly pleaded cause of action against Lowrance for damages for breach of an express contract was submitted to the jury via two verdict directing instructions without the benefit of any amendments to Clayton's

petition. One verdict directing instruction, without mention of any amount, relied on breach of an express contract as a legal vehicle for recovery and the other verdict directing instruction relied on "money had and received" (resting on concomitant doctrines of restitution and unjust enrichment) as a legal vehicle for recovery of $84,000.00 of the $95,225.00 sued for. Lowrance's theory of "detrimental reliance" was incorporated in Instruction No. 6, a verdict directing instruction requested by and given on behalf of Lowrance, which has become the source of one of Clayton's points on appeal.

One now begins to truly appreciate the dilemma faced by the trial court, because up until submission of this case to the jury neither Clayton's petition nor its counsel gave any hint that its legal theory of recovery against Lowrance to the extent of $84,000.00 was for "money had and received". Moreover, counsel for Lowrance made no request to formally amend his answer and plead "detrimental reliance" until the close of all the evidence. What motivated counsel for Lowrance to do so at that juncture remains a mystery. The indulgence of speculation and conjecture suggests a choice between raw luck or rare clairvoyance on the part of Lowrance's counsel as the motivating factor. In any event, up until the time the case was submitted to the jury, the trial court was kept in the dark by Clayton, wittingly or unwittingly, as to the legal theory upon which it ultimately submitted its cause of action against Lowrance for recovery of the $84,000.00.

■ The granting of leave to Lowrance to amend his answer after the time had expired to do so as a matter of course lies at the heart of Clayton's first point on appeal. Rule 55.33(a)[1] is far from passive concerning the right of a trial court to grant leave to a party to amend his pleading "when justice so requires". Certain core language in Rule 55.33, "and leave shall be freely given when justice so requires", gives an affirmative rather than a passive tone to Rule 55.33's investiture of authority in a trial court to grant leave to a party to amend his pleading "when justice so requires". The grant or denial of leave to a party to amend his pleading "when justice so requires" uniquely rests within the sound discretion of the trial court and will not be disturbed on appeal unless it be shown that the trial court "palpably and obviously abused" its discretion in doing so. *Parsons Construction Co. v. Missouri Public Serv. Co.,* 425 S.W.2d 166, 174 (Mo.1968); and *State ex rel. Thomas v. Wolfsberger,* 519 S.W.2d 559 (Mo.App.1975).

■ Determination of whether a trial court abused its discretion in granting or denying leave to a party to amend his pleading in a given case is best measured in terms of whether "justice" is subserved or subverted by the course taken. If "justice" is subserved it is difficult to envision an abuse of discretion. Conversely, if "justice" is subverted an abuse of discretion is readily discernible. In this context, it cannot be said that the trial court abused its discretion in permitting Lowrance to amend his answer and plead "detrimental reliance". Pleadingwise, Clayton never acknowledged that it was relying upon restitution and unjust enrichment as its legal theory for recovery of $84,000.00 of the $95,225.00 sought from Lowrance. Of even more telling significance, any mention or acknowledgment of such as a viable legal theory was carefully avoided until the very eve of submitting the case to the jury. If one were inclined to do so he could fairly surmise from the record that Clayton hoped to shroud this legal theory of recovery in se-

---

**1.** "55.33(a) *Amendments.* A party may amend his pleadings once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend at any time within 20 days after it is served. *Otherwise, a party may amend his pleading only by leave of court or by written* consent of the adverse party; and leave shall be freely given when justice so requires. A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within 10 days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders." (Emphasis added.)

crecy until it was too late for Lowrance to meet it with any pleading or evidence. However, by some stroke of luck or rare degree of clairvoyance, Lowrance apparently sensed Clayton's subsonic theory of recovery and introduced evidence and amended its answer in hopes of meeting it.

Clayton's hue and cry of "surprise" and "prejudice" strikes no responsive cord in light of Clayton's pursuit of an unpleaded and zealously guarded theory of recovery as to $84,000.00 of its $95,225.00 claim against Lowrance. It cannot be seriously argued by Clayton that the facts surrounding Lowrance's plea of "detrimental reliance" came as a "surprise" because the record reveals that Clayton was aware that Lowrance had extended additional credit to Olson upon receipt of the $84,000.00 when Clayton took Lowrance's pretrial deposition. Clayton, at best, could only claim "surprise" that Lowrance *pleaded* "detrimental reliance", but not as to the *facts* upon which the plea was predicated. Even as to Lowrance's *plea* of "detrimental reliance", it is difficult to comprehend how Clayton could genuinely claim surprise in view of his ultimate theory of submission concerning the $84,000.00. From the standpoint of "prejudice", the degree of prejudice suffered by Clayton was minimal as opposed to that which would have been suffered by Lowrance if leave to amend his answer had been refused. Frankly, an overriding consideration is the stark reality that Clayton's formal pleading hiatus is the only logical explanation for Lowrance's plea of "detrimental reliance" having been so belatedly entered.

Having set in motion and concealed a need for Lowrance to amend its answer until the eve of submission, Clayton should not be granted relief from that which its own design or inadvertence brought about. On balance, "justice" was subserved rather than subverted when the trial court gave Lowrance leave to amend his answer. Perforce, it cannot be said that the trial court abused its discretion by doing so.

■ Attention now focuses upon Clayton's contention that the trial court erred in giving Instruction No. 6, Lowrance's verdict directing instruction responsive to Clayton's claim for restitution as to the $84,000.00, in that it did not require the jury to find that Lowrance "did not know nor could not have known in the exercise of reasonable care of the error made by [Clayton] in paying the $84,000.00 before he [Lowrance] extended additional credit to Olson." Parenthetically, it should be noted that Instruction No. 6, among other things, required the jury to find that the controversial $84,000.00 was credited by Lowrance to Olson's cattle account. In its brief Clayton contends the $84,000.00 which ultimately found its way into Lowrance's order buying account at the First American Bank of Skidmore occurred "as a result of the fraudulent activities of Olson". Although Instruction No. 6 required the jury to find that Lowrance had no knowledge (1) that Olson requested Clayton to transfer $84,000.00 to an account standing in Lowrance's name at the Citizens Bank of Newtown and had no knowledge (2) that Olson requested the Citizens Bank of Newtown to transfer $84,000.00 to Lowrance's account in the First American Bank of Skidmore, it did not require the jury to find that Lowrance "could not have known in the exercise of reasonable care of the error made by [Clayton] in paying the $84,000.00 before he [Lowrance] extended additional credit to Olson." A careful reading of Clayton's brief convinces this court that Instruction No. 6's failure to require the jury to find that Lowrance "could not have known" of Olson's activities "in the exercise of reasonable care" is the core of Clayton's attack. Otherwise put, Clayton argues that a lack of knowledge on Lowrance's part as to the tainted source of the $84,000.00 was not enough to bar Clayton's right of restitution premised on the doctrine of unjust enrichment if Lowrance could have known of its tainted source in the exercise of reasonable care. In reality, Clayton argues that the law placed an affirmative duty upon Lowrance to investigate or trace the source of the $84,000.00 deposited by Olson to Lowrance's cattle buying account at the First American Bank of Skidmore. Clayton's attempt to impress an affirmative duty upon Lowrance to in-

vestigate or trace the source of the $84,-000.00, however logical doing so might appear at first blush, must fail when placed in proper legal perspective and tested by trenchant legal principles.

As evidenced by the status of the pleadings and the unusual course of trial events that unfolded, and as further evidenced by the briefs of the parties on appeal, this case has been beset with considerable confusion, much of which was occasioned by the fact that remote and seldom touched areas of law were being dealt with and bilateral difficulty was encountered in reducing the real issues to fundamentals. By way of but one isolated example, Lowrance's plea of "detrimental reliance", when all the facts and competing theories were finally sifted, turned out not to be as inclusive as both parties appeared to believe. Some little heralded but decisively applicable principles of law, gleaned primarily from a conglomerate body of case law from other jurisdictions, refute Clayton's argument that Instruction No. 6 was fatally remiss in not requiring the jury to find, in order to hold for Lowrance, that Lowrance "could not have known in the exercise of reasonable care" of Olson's activities with respect to the $84,000.00. In 114 A.L.R. 382, 383 (1938), under an annotation captioned "Duty of innocent creditor to restore to third person money or other property of the latter received as result of fraud or mistake in transaction between debtor and third person", reference to one of the little heralded but decisively applicable principles is couched in the following terms: "It may be pointed out by way of introduction to the treatment of the question under annotation that it is generally held or assumed that money received in the regular course of business from one who fraudulently or feloniously obtained it from another may not be recovered by the true owner from the recipient, even though the latter received it in payment of an antecedent debt and parted with no new consideration for the same, if he had no knowledge of the fraud or of the felony." Although no Missouri cases are cited in support of this principle, numerous cases from other jurisdictions are cited for

its support in both the original annotation, 114 A.L.R. 382, supra, and in various volumes of the A.L.R. Blue Book of Supplemental Decisions. See: *Knapp v. First Nat. Bank & Trust Co. of Oklahoma City*, 154 F.2d 395 (10th Cir. 1946); *Hall v. Hall*, 241 Ala. 397, 2 So.2d 908 (1941); *Batson v. Alexander City Bank*, 179 Ala. 490, 60 So. 313 (1912); *Tanner v. Lee*, 121 Ga. 524, 49 S.E. 592 (1904); *Smith v. Des Moines Nat. Bank*, 107 Iowa 620, 78 N.W. 238 (1899); *Smith v. Knapp*, 297 Mass. 466, 9 N.E.2d 399 (1937); and *Stephens v. Board of Education*, 79 N.Y. 183 (1879).

Although the above cited cases variously involve money in both a strict and broad generic sense, none imposed an affirmative duty upon the recipient to check the source of funds received in order to avoid making restitution to the original transferor. Instead, they speak in terms of lack of knowledge and good faith and not in terms of an affirmative duty to investigate the source or character of such funds. The rationale employed in the cited cases for not imposing an affirmative duty of investigation upon a recipient appears to rest upon the unique position which money, and funds deemed its equivalent in the broad generic sense, occupy in the marketplace. Speaking of the legal uniqueness of money, the Supreme Court of Georgia, in *Tanner v. Lee*, supra, 49 S.E. at 593, had this to say: "Money not only has no earmarks, but is currency, passing by delivery from hand to hand. It may be accepted in good faith, without any obligation to examine the holder's title, or to inquire the source from which he got it. One can give a better title thereto than he himself has, and one who receives it bona fide for a consideration may retain it as against the true owner." Like characteristics were attributed to money in *Newco Land Co. v. Martin*, 358 Mo. 99, 213 S.W.2d 504, 509 (1948): "Money is currency, is not earmarked and passes from hand to hand. There is no obligation on a transferee to investigate a transferor's title or source of acquisition of money when accepted honestly and in good faith. One may give a bona fide transferee for value a better title to money than he himself has."

Clayton's attack on Lowrance's verdict directing instruction is, at best, a thinly disguised effort to inject a new or additional element into the little heralded but decisively applicable principles of law which this court deems controlling. To succumb to Clayton's view would jeopardize the high mobility and quick and ready acceptance of money and equivalent funds such as those involved in the instant case as mediums of exchange in the ordinary course of affairs in the marketplace.

Clayton's evidence vis-a-vis Lowrance's evidence presented a question of fact to the jury with respect to whether Lowrance had knowledge of the tainted source of the funds deposited to his account at the First American Bank in Skidmore. The jury obviously resolved this question of fact in favor of Lowrance. As the law deemed controlling placed no affirmative duty upon Lowrance to investigate the source of the funds deposited to his account, it cannot be said that the jury was erroneously or improperly instructed in the sense charged by Clayton. The jury, under all the evidence, could and apparently did, conclude that the $84,000.00 mentioned in the various "customer's confirmation slips" and the $84,000.00 deposited to Lowrance's account at the First American Bank in Skidmore, with the notation "Olson Newtown" contained on the deposit slip, were wholly unrelated insofar as knowledge possessed by Lowrance was concerned and their identity in amounts was merely coincidental.

▪ Clayton's third and final point seeks to fault the trial court for failing to sustain its post trial motion to set aside the jury verdict and the judgment entered thereon and to enter judgment in favor of Clayton and against Lowrance in the sum of $95,225.00, all in accordance with Clayton's motion for directed verdict at the close of all the evidence. At least three reasons readily come to mind which strip this point of any real substance. First, in advancing this point Clayton necessarily assumes that Lowrance had an affirmative duty to verify the original source of funds from which the $84,000.00 emanated, and, in doing so, infer-

entially ignores the little heralded but decisively applicable principles of law heretofore discussed. Second, Clayton turns its back upon the firmly established and reigning principles that "ordinarily" it is the function of juries to "pass upon all oral evidence" and a trial court is seldom "justified in directing a verdict in favor of a party having the burden of proof where the case depends upon oral testimony." *Beezley v. Spiva*, 313 S.W.2d 691, 695 (Mo.1958). Third, but by no means least, whether Lowrance had knowledge of the character and source of the allegedly tainted funds on December 19, 1975, the date the $84,000.00 was both deposited to Lowrance's account at the First American Bank of Skidmore and accepted by Lowrance as a payment on Olson's cattle account, was a highly controverted and sharply contested issue of fact for the jury. This alone saps Clayton's third and final point of all vitality.

Finding no valid legal grounds upon which to disturb the result reached by the jury in this case, the judgment below is affirmed.

All concur.