## BILLS v. SCHLIEP.

(Circuit Court of Appeals, Second Circuit. December 6, 1903.)

### No. 34.

1. BANKRUPTCY—RECEIPT OF GOODS BY BANKRUPT—FORWARDERS—NATURE OF RELATION.

In an action by the trustee in bankruptcy of a shipper of certain fruit for defendant's assignors to factors for sale, evidence reviewed, and *held* to establish that the bankrupt was a mere agent of the assignors to forward the goods to the factors, and not their factor, who, as such, consigned the goods to the consignees as subfactors.

2. SAME—SALE OF GOODS—PROCEEDS—TRUST—RIGHT TO FOLLOW.

Where a factor receives the proceeds of goods sent him for sale, the factor's principal may equitably follow the money so received into the hands of any person who receives them with knowledge of their trust character.

3. SAME—MINGLING TRUST FUNDS.

Where factors received goods for sale from a forwarder for the shippers, and were thereafter notified that certain car loads of the shipments belonged to defendant's assignors, and were directed to report sales of such cars to them direct, after which the forwarder became bankrupt, the shippers of such cars were entitled to recover the proceeds of the sale thereof from the factors, notwithstanding the latter mingled the funds received from the various shipments, since, after notice of the forwarder's want of title in the particular cars, it would be presumed, in equity, that the factors would satisfy their claims out of the other shipments in their hands before resorting to the cars in question, or they would be deemed to have held the entire proceeds not necessary to satisfy their claims for the use of the consignors of the cargoes in question.

Appeal from the Circuit Court of the United States for the Eastern District of New York.

Appeal by defendant from final decree of the United States Circuit Court for the Eastern District of New York adjudging that the plaintiff was entitled to the whole of a certain fund, except $150.63.

Chas. L. Atterbury, for appellant.

P. B. Safford, for appellee.

Before LACOMBE and TOWNSEND, Circuit Judges.

TOWNSEND, Circuit Judge. The plaintiff in the court below is the trustee in bankruptcy of one Howard, who was adjudicated a bankrupt on or about March 13, 1899. Between September 1, 1898,

¶ 2. See Factors, vol. 23, Cent. Dig. § 95.

and March 10, 1899, said Howard had received from various fruit growers 105 car loads of fruit, and had shipped them from San José, Cal., to his consignees, the firm of Turle & Skidmore, in New York, for sale. They sold the fruit. The gross proceeds of said sales were $97,872.09, and the consignees, after deducting amounts paid on Howard's drafts drawn on them, and freight and charges, had a balance on hand of $6,686.79.

The defendant, Schliep, as assignee, represents four of said fruit growers, who claimed that six of the cars so consigned by Howard to Turle & Skidmore were their property, and that they were severally entitled to the net proceeds thereof received by Turle & Skidmore. It is unnecessary to rehearse the proceedings leading up to the assignment to Schliep, and his substitution as defendant. The sum of $6,502.22 is on deposit with the Washington Trust Company, subject to the order of court.

This action is at law by the trustee in bankruptcy against this assignee, and the question at issue is as to the right of the trustee to so much of said balance as represents the amount of net proceeds of the sale of said six car loads of fruit.

In February, shortly before Howard was adjudicated a bankrupt, these four shippers notified Turle & Skidmore that these specific six car loads of fruit belonged to them, respectively, and they requested Turle & Skidmore to hold said car loads, or the proceeds of the sale thereof, subject to their orders. Turle & Skidmore refused to recognize said claims; stating that, as all business had been done through Howard, they could only deal with him in the matter of settlement.

The decision of the case depends upon whether Howard was a mere agent of the shippers to forward goods to their consignees and factors, Turle & Skidmore, as claimed by defendant, or whether he was the factor of the shippers, who, as such factor, consigned the goods to his subfactors, Turle & Skidmore, as claimed by plaintiff.

Howard was not called as a witness. Such correspondence of his as appears in the record seems to indicate that at or about the time of his suspension the relation between at least two of defendant's assignors and Turle & Skidmore was that of shipper and consignee, and that he had no interest in said shipments, except his commissions. Thus, on February 13th he advises Turle & Skidmore "to work direct with Enright and simply allow Howard & Co. our commission," as to two cars, and, in regard to the car "belonging to Mr. E. M. Thomas," urges the same course, and says that, "in case we have to make an assignment, neither of these three cars will appear in our schedule." Howard's bookkeeper, Worcester, testified that Howard did business on his own account, handling his own fruit, and acting as factor or broker for shippers and owners of dried fruit, and that Turle & Skidmore were his correspondents; that no one of the 105 cars was shipped by the owner in his own name to Turle & Skidmore, but that, when shipped in the name of the shipper, the goods were in each instance brought in to Howard, and he made the shipment. It appeared, however, on his cross-examination, that some shipments had been made—notably, one by Thomas, one of defendant's assignors, in the name of the owner, to Turle & Skidmore, with

instructions to credit a certain sum to account. Worcester further testified that, when goods were sold, Howard and Turle & Skidmore divided between them a commission of 5 per cent.

The bookkeeper for Turle & Skidmore testified that Turle & Skidmore were the agents at New York of Howard; that they had no direct relations with the four shippers herein; that they recognized no one except Howard in their business; that all proceeds of sales of his shipments, and drafts and other charges thereon, were respectively credited or debited to his account; and that they had always accounted to him, and never to any one else, for consignments and sales.

Inasmuch as there are some material differences in the relations between the various shippers and Howard, it will be necessary to consider their testimony separately.

Enright testified that he shipped the two car loads of prunes in question through E. B. Howard to Turle & Skidmore to be sold; that he had been doing business with them for several years, and, while the accounts of sales in previous dealings had been rendered to him through Howard & Company, he only employed Howard to forward the goods to Turle & Skidmore because he understood that Turle & Skidmore would not handle any goods except those that came from Howard; that he employed Howard only to forward them. As already shown, Howard wrote to Turle & Skidmore, notifying them that Enright had two cars of fruit with them; and he also asked them to advance money to Enright as he (Enright) might need it, and to work direct with Enright.

J. J. Shaner testified that he had been doing business with Turle & Skidmore since 1886; that Skidmore visited him in 1889, and that at that time he told Skidmore he wished to send the fruit direct to him, but that Skidmore said "that any fruit that I consigned to him would have to go through Mr. Howard at present"; that, pursuant to these instructions, he shipped a car of fruit through Howard & Co., as agents for Turle & Skidmore, telling Howard that "I wanted him to ship to Skidmore, at Skidmore's request," and that he (Shaner) told Skidmore he could pay Howard whatever commission he wished; that he shipped the goods through Howard only because he was so instructed by Skidmore, and had no agreement with Howard that he (Howard) should receive any compensation from him (Shaner).

Worcester, the bookkeeper for Howard, whose testimony has already been referred to, says that he had personal knowledge that the car of fruit shipped by Shaner was placed in Howard's hands differently from other cars of fruit which had been placed by Shaner in Howard's hands, and that, while he had no personal knowledge that Shaner was the owner of the goods, he knew no one else in the transaction, and did know that Howard had no interest therein.

Knowles testified: That he met Skidmore in California. That Skidmore told him that Howard was his agent or representative there; that he wished him (Knowles) to do business with his firm through Howard. That thereafter, through said agent, Howard, he asked Turle & Skidmore to take charge of a car of prunes which had been consigned to another party at New York, and agreed, if they would do so, to ship them other car loads of fruit for sale,

which are the car loads here in question. That they did ship said prunes, and that they received a letter from the salesman of the firm of Turle & Skidmore, in response thereto, agreeing to sell the fruit as promptly as possible. The whole correspondence between Knowles and Turle & Skidmore indicates that Knowles was dealing with Turle & Skidmore direct, and sent said car loads to them, and that the only relation of Howard to the transaction was that the bills of lading made out to Knowles were indorsed by him over to Howard because of Skidmore's previous request to that effect.

In a letter written by Knowles to Turle & Skidmore, which, however, was subsequent to Howard's bankruptcy, they explained the second shipment of prunes by saying:

"We shipped the cars to you on our behalf, for you to recoup yourself for any loss on the car of mouldy prunes, the draft against which you paid in full. We can imagine no other charges against these cars."

It is admitted that Howard had no interest in the original transaction concerning the mouldy prunes.

E. M. Thomas testified that he had previously sold fruit directly to Howard, but that he consigned the car load here in question to Turle & Skidmore upon the advice of Howard, who told him he could get a better price in that way. It will be remembered that this is the car as to which Howard notified Turle & Skidmore that it belonged to Thomas, and would not appear in his schedule if he were obliged to make an assignment.

In this conflict between the testimony of the two bookkeepers and the shippers, it is impossible to accurately define the status of Howard in these transactions. But we think, whatever may have been the relations existing between him and Turle & Skidmore, and whatever may have been the understanding of Turle & Skidmore as to his relations with said shippers, the practically undisputed facts, so far as these shippers are concerned, show that they never authorized him to act as their factor or commission merchant, but that they dealt with him merely as the agent of Turle & Skidmore, and that they must be considered as having thus, through Howard, employed Turle & Skidmore to act as their factors, merely making Howard their forwarding agent to effectuate this transaction, because Turle & Skidmore insisted that this course should be taken through Howard, as their representative in California.

In the determination of the rights of these shippers herein, the question as to whether Turle & Skidmore recognized them in these transactions is immaterial. Whether they originally knew the relations between the shippers and Howard, or whether he was acting as agent for undisclosed principals, they were bound, upon seasonable notice of the facts, to equitably marshal the assets in their hands, over and above the amount sufficient to satisfy their charges and claims, and, after notice, to hold such balance subject to the order of said fruit.

In whatever capacity Howard may have received these goods, it was upon the trust to deliver them to Turle & Skidmore for sale. The

debt of a factor for moneys received on sale of a principal's goods has been held not to be a debt created by one acting in a fiduciary capacity, within the meaning of the bankrupt law. Chapman v. Forsyth, 2 How. 202, 11 L. Ed. 236; Re Swift, 3 Nat. Bankr. N. 307. But the obligation of a factor for goods intrusted to him is of a fiduciary character, and, before sale, the principal may restrain an unauthorized disposition of such property, or compel observance of the conditions of such trust; and, after, the principal may equitably follow the moneys received from the sale of such goods into the hands of any person who receives them with knowledge of their trust character. Union Stockyards Bank v. Gillespie, 137 U. S. 411, 421, 11 Sup. Ct. 118, 34 L. Ed. 724. The money is held by such person subject to the disposition of the question: To whom, in equity, does it beneficially belong? National Bank v. Insurance Company, 104 U. S. 54, 26 L. Ed. 693; Manhattan Bank of Memphis v. Walker, 130 U. S. 267, 9 Sup. Ct. 519, 32 L. Ed. 959.

It is immaterial that Turle & Skidmore may have mingled the funds in their hands received from the various shipments, because, after such shipments and notice, the law will presume and a court of equity would require either that Turle & Skidmore should satisfy their claims out of the other car loads in their hands before resorting to the car loads in question, or would be deemed to have held all proceeds not necessary to satisfy their claims for the use of the owners and consignors of the cargoes in question.

In Hazard v. Fiske, 83 N. Y. 287, plaintiffs made advances to one Nims on the pledge of a bill of lading of a cargo of grain consigned to him at Buffalo. Afterwards Nims obtained possession of the grain, consigned it to defendants, and obtained advances thereon. Defendants had in their hands other funds, on which they had a lien, and which they had a right to apply to the payment of these advances. But after notice of plaintiffs' claim, they paid said other funds to a third party on the order of Nims. Nims became bankrupt. The court held, as to the defendants, that:

"If they had a general balance in their hands, belonging to Nims, sufficient to repay the advances made on the corn now in question, and the plaintiffs had a right, as against Nims, to that corn, or its proceeds, the defendants, after receiving notice of the plaintiffs' rights, could and should have resorted in the first instance to such general balance for their reimbursement, instead of resorting to the fund to which the plaintiffs were equitably entitled. * * * It was clearly their duty to respect the rights of the plaintiffs by retaining those advances out of this general balance, and thus exonerate the proceeds of the corn pledged to the plaintiffs."

The court further says:

"The plaintiffs were clearly entitled, as between them and Nims, to the corn or its proceeds. Their title was superior to that of any creditor or assignee in bankruptcy of Nims, or to that of any person in whose favor Nims might draw for such proceeds, or to whom he might assign them. All such transferees took subject to the prior equities of the plaintiffs. No one but the defendants appear to have been in a position to dispute the equities of the plaintiffs, and their right to do so existed to the extent only which was necessary to secure the payment of the advances which they had made, on the strength of the apparent possession and title of Nims. If they could reimburse themselves from other money of Nims in their hands, **after notice of the plaintiffs' rights**, equity clearly required them to do so."

· The same principle is asserted and applied in Le-Marchant v. Moore, 150 N. Y. 209, 44 N. E. 770.

The decree of the Circuit Court is reversed, with costs, with directions to order said fund to be paid over to the defendant, as assignee of said four shippers, in accordance with this opinion.