## STEERE et al. v. STOCKYARDS NAT. BANK. (No. 9686.)

(Court of Civil Appeals of Texas. Fort Worth. Dec. 3, 1921. Rehearing Granted June 11, 1924. Rehearing Denied Nov. 1, 1924.)

1. **Factors** ☞5—Cattle shippers held to consent to commission firm's custom to deposit proceeds in own name and made firm their broker or factor.

Where cattle shippers knew of commission firm's custom of selling cattle in own name and depositing proceeds in bank to own account and to remit net proceeds to shipper by his own check, and made no objection, they impliedly consented thereto, and firm was their broker or factor.

2. **Appeal and error** ☞931(1)—Evidence construed favorably to findings and judgment of trial court.

On appeal, evidence must be construed most favorably to imputed findings and judgment of trial court.

3. **Banks and banking** ☞130(1)—Overdrafts on depositor's account not notice to bank of his insolvency or of trust character of fund.

Mere fact that overdrafts from time to time occur in depositor's account is not notice to bank of his insolvency or of trust character of deposit.

4. **Banks and banking** ☞134(1)—Depositor impliedly agrees deposit may be applied to overdraft.

When deposit is made by customer whose account is overdrawn, customer impliedly agrees deposit shall be applied on overdraft.

5. **Bills and notes** ☞359—Extinguishment of past debt valuable consideration for transfer of commercial paper.

Extinguishment in whole or in part of past debt is valuable consideration for transfer of commercial paper.

6. **Bankruptcy** ☞165(1)—Bank's application of collections to insolvent firm's overdraft held not preference, but authorized under Bankruptcy Act.

Where bank, after insolvency of commission firm, credited collections and deposits by third person for firm on its overdraft created before insolvency, bank did not receive unlawful preference under Bankruptcy Law so as to entitle bankruptcy trustee to recover it, but this was authorized under Bankruptcy Act, § 68a (U. S. Comp. St. § 9652).

On Motion for Rehearing.

7. **Banks and banking** ☞134(6)—Bank knowing deposit contained trust funds entitled to apply on overdraft difference between deposits after overdraft and proceeds of sales.

Where bank knew that deposit by commission firm contained trust funds belonging to cattle shippers, it could apply to overdraft difference between total deposits after date of overdraft and total proceeds from sale of cattle belonging to shippers, but no more.

8. **Banks and banking** ☞134(6)—Bank receiving proceeds of goods without notice of freight claims entitled to apply them on overdraft.

Where carriers of cattle consigned to commission dealer delivered them depending on consignee to pay freight charges from proceeds of sale, they made dealer their debtor; and, where bank in which dealer deposited proceeds had no notice that any part belonged to the carriers, its application of proceeds on overdraft gave them no right of recovery against it.

**9. Banks and banking ⊕134(6)—Bank paying out check on commission firm's deposit containing trust moneys held not liable regardless of purpose of checks.**

Where commission firm had authority to deposit proceeds of sale of cattle and pay shippers by its own checks, though bank had knowledge of trust nature of deposit, it was entitled to pay checks drawn by firm before its insolvency regardless of purpose for which given, and was not required to charge them to surplus over trust funds, before applying surplus to overdraft.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by Geo. W. Steere and others against the Stockyards National Bank. Judgment for defendant, and plaintiffs appeal. Reversed and rendered in part, and affirmed in part on rehearing.

See, also, 256 S. W. 586; 258 S. W. 1042.

Goree, Odell & Allen, Bryan, Stone & Wade, Moses & Rowe, Aubrey Alexander, H. C. Ray, and E. S. Allen, all of Fort Worth, C. M. Cureton and W W. Caves, both of Austin, and Thompson, Barwise, Wharton & Hiner, McLean, Scott & McLean, Capps, Cantey, Hanger & Short, Alexander & Baldwin, Phillips, Trammell & Caldwell, and Glover C. Johnson, all of Fort Worth, for appellants.

Wm. J. Berne, of Fort Worth, for appellee.

CONNER, C. J. Stating this case briefly and in its chronological order, Herbert Graves was engaged in the live stock commission business on the Fort Worth Stockyards during the years 1915, 1916, 1917, and until October 5, 1918, when he failed. He did business under the trade-name of the Herbert Graves Commission Company. At the time of his failure he had outstanding checks covering the net proceeds of cattle consigned to and sold by him, aggregating some $92,000. On October 26, 1918, a petition in bankruptcy was filed against him, and he was adjudged a bankrupt on November 21, 1918. Geo. W. Steere was appointed trustee in bankruptcy on December 9, 1918, and on October 11, 1919, filed this suit in the district court of Tarrant county, Tex., to recover from the appellee Stockyards National Bank moneys which he alleged had been applied by the bank to the payment of an indebtedness, by overdraft of Herbert Graves on the bank; it being alleged that such payment constituted an unlawful preference under the bankrupt laws, and was also in fraud of the creditors.

E. A. Kelley and some 75 others intervened in the suit and severally sought to recover from the bank sums alleged by them to be due from Herbert Graves, as we shall hereinafter designate the Herbert Graves Live Stock Commission Company, as the net proceeds of cattle shipped to and sold by Herbert Graves and deposited in the appellee bank. These interveners, who will hereinafter be referred to collectively as shippers, alleged, in substance, that such proceeds constituted trust funds, and that the bank, with knowledge of the character of the funds and with knowledge of Herbert Graves' insolvency, had applied them to the payment of Herbert Graves' indebtedness or overdraft.

John Barton Payne, Director General of Railroads, and nine railroad companies, also intervened, claiming items of indebtedness aggregating $5,206.29, alleging that the items of indebtedness were due from Herbert Graves to the several railroad companies. These interveners will be hereinafter designated as carriers. The carriers alleged that the sums claimed were severally due as freight charges; that, by the custom of business upon the yards at the time, they were not collected from the shippers, but were to be paid by Herbert Graves out of the proceeds of the cattle sold; that such proceeds, including said sums for freight, had been deposited in the appellee bank and by the bank applied to the liquidation of Herbert Graves' overdraft, with knowledge of the trust character of the fund.

The appellee bank denied that it had exercised or obtained an undue preference under the bankruptcy laws, and also denied knowledge of Herbert Graves' insolvency, and denied that it had knowledge of the trust character of the funds claimed by the several interveners at the time it had applied the funds deposited by Herbert Graves to the payment of his indebtedness, alleging, in substance, that during the years specified that Herbert Graves did a large business, only a part of which consisted of selling cattle for others, and from time to time deposited large sums of money in the bank, and from time to time created overdrafts which were subsequently paid. And that, as already stated, at the time of Herbert Graves' failure and at the time of the application of the moneys deposited by Herbert Graves to the liquidation of his indebtedness, the bank was without knowledge of the trust character of the funds.

The trial was before the court without a jury, and resulted in a judgment in favor of the bank, except as to the sum of $317.85, which was awarded to the plaintiff trustee in bankruptcy. From this judgment the plaintiff trustee, the shippers, and the carriers have appealed, and the bank cross-assigns error to the judgment against it in favor of the trustee for the said sum of $317.85.

The labor involved in the consideration of this case has been considerable, inasmuch as we have before us some 800 pages of transcript and statement of facts, four briefs,

⊕For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

aggregating nearly 500 pages, with citation of numerous authorities. We have endeavored to consider the whole as carefully as our ability and time would permit, but by no means feel certain that we can, within reasonable limits, satisfactorily dispose of the whole. We, however, have been greatly aided by the briefs severally presented by the able counsel who are representing the various litigants. With the aid thus presented, we entertain the view that the case, after all, is comparatively a simple one. We think the vital issue, around which, except as hereinafter noted, all other questions revolve, is whether, at the time of the bank's application of the proceeds deposited therein by Herbert Graves, it had knowledge or notice of facts from which such knowledge must be imputed that Herbert Graves was insolvent and that the funds deposited by him with the appellee bank and by the bank applied in liquidation of Herbert Graves' overdraft were trust funds, or, in other words, funds that rightfully belonged to the shippers and other claimants in this suit.

[1] In the beginning, it may be stated that the evidence is undisputed that Herbert Graves during the years 1915, 1916, 1917, and until October 5, 1918, did business on the Fort Worth Stockyards as a live stock commission dealer, and that at least a part of such business was to receive consignments of cattle, sell the same, and remit the net proceeds to the shippers. He did business with the appellee bank only, and his custom during the years stated was to make deposits in his own name with the appellee bank and remit to the shippers the net proceeds of cattle sold by him for them by his personal check, except in instances, which apparently were few, where shippers demanded exchange. The deposits included his charges for commission, freights, yardage, feed charges, etc. There is no evidence tending to show that any of the shippers named in this controversy were without knowledge of such custom or made any objection thereto. In other words, we think it must be implied that the shippers consented to such method and manner of depositing and remitting of the proceeds.

As between the shippers and Herbert Graves, therefore, the latter undoubtedly occupied the relation of a broker or factor. Hence it will be helpful in the beginning to briefly view the duties and liabilities of the parties as determined by the law.

The authorities cited and discussed in the briefs of counsel are numerous, but we cannot hope within reasonable limits to do more than refer to those that we deem controlling. In one of our own cases, which seems to be in accord with the great weight of authority, to wit, the case of Interstate National Bank v. Claxton, 97 Tex. 569, 80 S. W. 604, 65 L. R. A. 820, 104 Am. St. Rep. 885, our Supreme Court held that where, as

here, general authority was given factors selling cattle to make deposits in a bank for their principals, such deposits were rightfully made and received and created the relation of banker and depositor, and that therefore the bank was bound to recognize and pay the factor's checks on the fund, even though at the time of making them the commission merchant, within the knowledge of the bank, was insolvent and had committed an act of bankruptcy, or an act for which he was subsequently adjudged bankrupt. There is no contention in this case that the appellee bank is liable for any amount paid out by it on checks drawn by Graves. But it was further held in that case that the bank, having knowledge that the funds so deposited belonged to another, could not lawfully apply the funds so owned by the other in extinguishment of an overdraft or indebtedness of the insolvent factor, and it is under the rule thus announced that appellants claim.

The editor of the annotation to be found in volume 13 of the American Law Reports, Annotated, page 325, says this:

"It is universally conceded that knowledge upon the part of a bank that deposits made by a debtor in his own name belong to a third person absolutely precludes the bank from applying such funds to the individual indebtedness of the depositor to it."

In support of the quotation made, cases are cited from courts of the United States, Alabama, Arkansas, California, Indiana, Delaware, Georgia, Illinois, Kentucky, Louisiana, Maine, Michigan, Mississippi, Missouri, Nebraska, Nevada, New York, North Carolina, Pennsylvania, Oklahoma, Tennessee, Texas (including the case of Bank v. Claxton, supra), Virginia, England, and Scotland. But the same authority further says on this subject in the same note that—

"The decided weight of authority is to the effect that where the bank in which funds in which third persons have an interest are deposited in the individual name of the depositor has neither actual knowledge, nor notice of facts sufficient to put it upon inquiry, as to the true character of the deposit, it may apply the deposit to the individual debt of the depositor"—citing and reviewing numerous cases from the courts of the United States and other states of the Union.

We think the case of Bank v. Claxton and other authorities referred to, including the quotation made, states the rule supported by numerous authorities cited in briefs of counsel, and must be accepted as the rule to be applied in the determination of this case.

[2] We must now, therefore, add to our statement of the facts deducible from the evidence and determine whether or not the appellee bank, under the rules stated, is liable for any funds deposited by Herbert Graves that may have been applied to an

indebtedness or overdraft of Graves, and in stating the facts we must be guided by the rule well settled by the authorities that the evidence must be construed most favorably to the findings that must be imputed to the court, and in support of the judgment. So proceeding, we think it must be held that the shippers constituted Herbert Graves their agent to sell the cattle, to receive the purchase money, and to deposit it to his individual credit in the appellee bank, and to remit the amount due the shipper by his personal check; that the information of the controlling officers of the bank was to the effect that Herbert Graves in the year 1915 had as much as $95,000 invested in the different branches of his commission business, and that later, through a government contract, he had made a profit of some $25,000 or $30,000; that in the early summer of 1918 he submitted to the controlling officers of the bank a partial financial statement which showed that he then had in the different branches of his commission business, other than that of selling cattle on commission for others, and after payment of all outstanding checks, between $35,000 and $50,000 in cash, and that the officers of the bank could reasonably believe, as they in fact did believe, that this statement showed the true condition of Herbert Graves' business at the time; that from time to time Graves created overdrafts in the bank in considerable amounts, which, previous to the closing of his business, he had promptly met; that throughout the three years preceding his failure, the selling of cattle on commission for others was but one of several branches of his business, and of the proceeds of such business deposited by him, the bank had reason to believe that only one-third was made up from the proceeds of cattle sold on commission for others; that the deposits were not so made in form or with attendant circumstances as to enable the bank to distinguish between the proceeds of cattle sold for others and the proceeds arising from other branches of his business.

The evidence further shows that the claims of the shippers cover the period from September 25, 1918, to October 5, 1918, and aggregate $92,889.63; that during this period, from day to day, Graves deposited the aggregate sum of $325,551.27. On September 30, 1918, Graves' overdraft, at the close of business, was $45,744.69, on October 1, 1918, it was $24,631.66; on October 2, 1918, it was $19,594.65; on October 3, 1918, it was $12,577.50; on October 4, 1918, it was $13,726.84; and on October 5, 1918, it was $5,478.58. At the time of the $45,744.69 overdraft, on September 30th, and before the overdraft was created, Mr. Sparks, president of the appellee bank, called up the office of the commission company and told them that incoming checks would create the overdraft and inquired for information. In answer to the inquiry, Mr. Sparks was informed that Herbert Graves had sold of his own cattle some $65,000 worth, the proceeds of which were then in transit and would be deposited within a few days, whereupon Mr. Sparks honored the outstanding checks of Graves and the overdraft stated was thus created. It further appears that amounts in excess of the overdraft were in fact deposited by Graves within a few days, and that from day to day deposits were made by Graves and his checks honored until the 5th day of October, upon which day knowledge of his insolvency became known to the bank, and it closed his account and refused to further honor his checks; the balance of Graves' indebtedness by overdraft at that time being $5,478.58, as appears from the statement already given.

We cannot say that the trial court erred in concluding, as he evidently did, that the appellee bank had neither actual nor constructive notice that the funds deposited by Herbert Graves and applied in the liquidation of the overdraft, or overdrafts, in question, were trust funds. It is not pretended that at the time the bank had actual notice from either Herbert Graves or any one of the shippers, or other person, that any part of the funds so deposited and applied belonged to him, and the mere fact that Graves was engaged in the business of selling cattle for others, the deposits being made in the individual name of Graves with the consent of the shippers, did not necessarily affect the bank with notice, especially in view of the further fact that within the knowledge of the bank selling cattle for others was only a part of Graves' business. See First State Bank v. Hill (Tex. Civ. App.) 141 S. W. 300; Kimmel v. Bean, 68 Kan. 598, 75 P. 1118, 64 L. R. A. 785, 104 Am. St. Rep. 415; Stephens v. Board of Education, 79 N. Y. 183, 35 Am. Rep. 511; Smith v. Bank, 107 Iowa, 620, 78 N. W. 238; and cases that might be cited and which are referred to in appellee's brief. We will quote from but one of the cases we have cited, to wit, Kimmel v. Bean, quoting from the headnotes of that case as reported in 104 Am. St. Rep. 415. It is said:

"The fact that a bank knows that a person depositing a check is engaged in the commission business and sometimes overdraws his account does not charge it with notice that a check deposited by him is for property sold for one of his customers who is entitled to the proceeds thereof.

"Where a depositor carries an account with a bank as part of his usual business, continually drawing checks and making deposits, sometimes having a balance to his credit and sometimes being overdrawn, his mere act of making a deposit is equivalent to an agreement that it shall be applied against any overdraft that may exist at the time.

"A bank cannot be held to account to the owner of a fund which has been deposited by

an agent in his own name and applied on his overdraft, the bank having no knowledge of the agency."

[3] The same case is authority for the conclusion that the mere fact that an overdraft, or overdrafts, from time to time may occur in a depositor's account, does not amount to notice either of his insolvency or of the trust character of the fund deposited.

Among others to whom Graves sold cattle on commission were Swift & Co. and Armour & Co., packers. In such cases when a sale was made to the packer's buyers, the cattle were weighed, a slip or scale ticket was made out by the weigher, upon which was designated the name of the commission firm making the sale, the name of the person in whose name the shipment had been made, the person to whom sold, with the weights, classes of cattle, etc. These tickets were passed to the office of the packer and, when there approved, were sent direct to the bank with instructions to credit the selling commission company with the net amount of the sale, as indorsed on the slip accompanying the ticket. The bank thereupon entered upon its books, to the credit of the salesman, the net amount so forwarded to it. Appellants insist that these tickets were sufficient to put the bank upon notice that the net amounts so returned constituted funds belonging to the shipper. We have not analyzed the evidence so as to determine or specify the particular shippers to whom deposits so made in fact belonged, nor the proportion of such deposits to the whole amount involved, nor do we find such information pointed out in the briefs; but, however this may be, we feel unable to say, under the evidence, that the court erred in concluding that the bank was not put upon notice of the character of the funds deposited and to whom the same belonged. There was evidence to the effect that the receiving teller was required, in the performance of ·his duties, to look only to the net amount upon the slip; that slips, after such entries, were returned to and kept in the files of the packing company; that at times the name of the shipper was stated or indicated by initial only; that in instances the name of the shipper as stated on the ticket did not indicate the true owner; that sometimes in the conduct of Graves' business he sent buyers in the field who purchased cattle for him, which were shipped in the name of the buying agent and consigned to the Herbert Graves Commission Company, and thereafter sold. It further was made to appear that the bank did business with numerous other commission firms operating on the Fort Worth Stockyards, and it would certainly be requiring a great degree of care and exactitude to insist that the bank should in each instance institute inquiries and ascertain the true owner of the fund. In the case of State National Bank v. Dodge, 124

U. S. 333, 8 S. Ct. 521, 31 L. Ed. 458, it was held, in effect, that a bank is not required to take notice of information contained in mere memoranda on the face of a check drawn by a depositor and paid by the bank. And in State National Bank v. Reilly, 124 Ill. 464, 14 N. E. 657, it was said, among other things:

"It is well known * * * that * * * the practice among banks paying checks of their depositors is not to observe memoranda upon such checks, but the custom is to regard them as having been made for the convenience of the drawers, and the practice in that regard, it is thought, has the sanction of law in its support."

In the case of Duckett v. Bank, 86 Md. 400, 38 A. 983, 39 L. R. A. 84, 63 Am. St. Rep. 513, it was said, quoting from the headnote:

"A bank is not bound to take notice of memoranda or figures on the margin of a check which the depositor· placed there for his own convenience to preserve information for his own benefit."

In the case last cited, the check in question read:

"Citizens' National Bank. Pay to the order of James Scott, cashier, $2,000, two thousand dollars, for . deposit to credit of Henry W. Clagett, being the balance of purchase money due him as trustee from John R. Coale.
                    "[Signed]  C. H. Stanley."

In that case it appeard that the money mentioned in the check was placed to the individual credit of Clagett, and it was claimed that the recitation in the check that the amount constituted "the balance of purchase money due him as trustee from John R. Coale" was sufficient to put the bank upon notice that the funds were impressed with a trust, but it was held otherwise. See., also, Brown v. Cow Creek, etc., Co., 21 Wyo. 21,. 126 P. 886; Bank v. Kenney, 116 Md. 24, 81 A. 227, Ann. Cas. 1913B, 1337; Brady on Laws of Bank Checks, § 158, p. 230.

The claim of the intervener App Smith in part rests upon some additional facts relating to his claim. It was shown that on the 3d or 4th of October, 1918, there was delivered to Graves, as consignee, by the transportation companies, about 100 head of App Smith's cattle. Herbert Graves had been commissioned by a Mr. Hamilton of Cuero, Tex., to buy a certain number and class of cattle for him (Hamilton). Graves concluded that the Smith cattle met the requirements, and he bought of Smith some 90-odd head and shipped them to Hamilton at Cuero. Graves gave Smith his personal check on the appellee bank, which has never been paid, and drew on Hamilton at Cuero with bill of lading attached for the price of the cattle, including his ·commission and other charges. This draft on Hamilton with bill of lading attached was deposited and passed to

Graves' credit in the appellee bank on the 4th day of October, and was forwarded by the appellee bank to a bank at Cuero for collection. Several days after the appellee bank had closed Graves' account, to wit, on October the 6th or 7th, the bank at Cuero informed the appellee bank, by wire or telephone, that Smith was claiming that he had not been paid for the cattle and was demanding delivery of the cattle to him. The appellee bank, however, insisted upon Hamilton's paying the draft, which he agreed to do, and did do upon appellee's guaranty to save him harmless, and the proceeds thereupon were returned to the appellee bank and applied to Graves' overdrafts about October 9, 1918. It was shown in the testimony that App Smith was in the yards at the time his cattle arrived and were delivered to Graves as consignee; that he knew of the transaction on the day the cattle were sold to Mr. Hamilton; that his instructions to Graves were to send the proceeds of the sale of cattle to the Llano National Bank; that he told him to "send exchange to the Home National Bank." There was evidence to show, and we must hold that the court below so found, that the appellee bank accepted the bank's draft on Hamilton at Cuero and passed the amount thereof to Graves' credit in good faith and in due course of business without knowledge at the time of Graves' insolvency and without knowledge at the time that the fund belonged to Smith or to any other person than Graves himself. It is inferentially true, at least, that in the transaction Graves was acting as the agent of Hamilton in the purchase of the cattle from Smith. Under such circumstances, the draft drawn by Graves on Hamilton amounted to a legal and binding obligation on Hamilton's part, of a character constituting it the subject-matter of a purchase in good faith, as would have been the case had it been a promissory note accepted by the bank at the time and under the circumstances and passed to the credit of Graves. See Raymond v. Mann, 45 Tex. 301; Gray Tie & Lumber Co. v. Bank, 109 Ky. 694, 60 S. W. 537; Watauga County Bank v. McQueen, 130 Tenn. 382, 170 S. W. 1025; Daniel, Neg. Insts. (6th Ed.) § 832a.

[4] Authorities are also numerous to the effect that when a deposit is made by a depositor whose account is overdrawn, the act of making a deposit amounts to an agreement that the deposit shall be applied on the overdraft. See Kimmel v. Bean, supra; Shuman v. Bank, 27 N. D. 599, 147 N. W. 388, L. R. A. 1915A, 728; Bank v. Kenney, 116 Md. 24, 81 A. 227, Ann. Cas. 1913B, 1337. In the case last cited, it is said, among other things:

"The general rule is well settled that when a depositor is indebted to a bank, the bank may apply his deposits, or such portion there-of as may be necessary, to the payment of his indebtedness; unless there be an agreement to the contrary, or unless the deposit be specially applicable to some other particular purpose, or unless the bank has notice that the funds do not belong to the customer. This right to apply the deposit to the customer's indebtedness is called the banker's lien, or right of set-off, and does not depend upon the customer's assent. Instances of its application are most frequently found in the case of antecedent debts. We have found no case holding that the consent of the customer was a prerequisite of the bank's right to assert its lien."

[5] It is a further rule that the extinguishment, in whole or in part, of a past-due debt, is a valuable consideration for the transfer of commercial paper. Blum v. Loggins, 53 Tex. 121; Heffron v. Cunningham, 76 Tex. 312, 13 S. W. 259; Herman v. Gunter, 83 Tex. 66, 18 S. W. 428, 29 Am. St. Rep. 632; Greneaux v. Wheeler, 6 Tex. 515. In the case last cited, among other things, it is said:

"The great weight of authority is that a transfer for a precedent debt is in the usual course of trade, and the holder must be treated as a bona fide holder for value. * * * A part of the consideration in this case was a pre-existing debt; and I have glanced at the subject to show, that, from the current of authorities, such consideration is valuable, and that a note is taken in the bona fide course of trade, when transferred on such consideration."

We conclude, therefore, that we cannot disturb the trial court's finding relating to the claim of App Smith.

We also conclude that we cannot disturb the finding of the trial court which precludes a recovery by the intervening carriers. As before stated, the carriers failed to collect their transportation charges upon the arrival of the cattle on the stockyards, but trusted to the commission men to pay such freight charges out of the proceeds of the cattle when sold, and in so doing we think they, in effect, but constituted the commission firm so owing freight charges their debtors, and we find nothing in the record which requires us to find that the bank knew what part, if any, of the money deposited by Graves included any specified amount of freight charges due to any carrier.

[6] As to the items of indebtedness claimed by the trustee in bankruptcy, and not included in the claims of any of the interveners, we think it sufficient to say that there was evidence tending to show that such items were passed to the credit of Graves and applied to his overdraft prior to October 5th, and without knowledge of Graves' insolvency, and therefore operated as an extinguishment pro tanto of the overdraft. And the fact, as appears in the evidence, that these items were collected and received by the bank after October 5th can make no difference. The items for the most part were in the form of drafts or checks on other per-

sons, received by the bank upon the faith that Graves was entitled to the proceeds then in transit or soon to be in transit. The application of such proceeds to the overdraft, under such circumstances, cannot, we think, be said to constitute a preference under the bankruptcy laws which entitled the trustee in bankruptcy to recover. And this conclusion, we think, applies as well to an item of $183.53 for which Graves in fact had long before been credited, but which credit had not been discovered until an examination of the accounts after his insolvency. The conclusion also applies, we think, to the items claimed by appellee, under its 'cross-assignment and for which the trustee in bankruptcy was awarded judgment. The evidence shows that Swift & Co. deposited to the credit of Graves with the appellee bank the following sums on the following dates; to wit: October 7, 1918, $20.70, October 8, 1918, $286.97, October 21, 1918, $10.18, making a total of $317.85. The bank offset these deposits against the Graves' debt. Inferentially, at least, the sums designated in the items were proceeds of cattle theretofore sold Swift & Co. by Graves, and which had not been transmitted to the bank prior to October 5th, when Graves ceased to do business. The deposits appear to have been made as had theretofore been the custom, and nothing indicates that Graves interposed any objection. Under such circumstances, we think, as appellee contends in its cross-action, that the bank had a right to apply the deposits to Graves' overdraft and that such application did not amount to the obtaining of an undue preference, within the meaning of the bankrupt laws. While Graves became bankrupt and ceased to do business on October 5th, the petition in bankruptcy was not filed until October 26, 1918, and adjudication in bankruptcy was not made until November 21, 1918. Section 68a of the Bankruptcy Act (U. S. Comp. St. § 9652) provides:

"That in all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

The appellee bank was undoubtedly a creditor of Graves, and the section of the bankrupt law quoted evidently recognizes the right of a creditor, in cases of mutual debts and credits, to set off one debt against another; the balance only to be allowed to the bankrupt or to the trustee in bankruptcy. See Studley v. Boylston Bank, 229 U. S. 523, 33 S. Ct. 806, 57 L. Ed. 1313; Cumberland Glass Co. v. De Witt, 237 U. S. 455, 35 S. Ct. 636, 59 L. Ed. 1042.

We accordingly conclude, without further pursuing the subject, that appellee's cross-assignment of error must be sustained, and that as to the items awarded to the trustee in bankruptcy by the judgment of the court, the judgment below should be reversed and here rendered for appellee. The judgment for the reasons indicated is in all other respects affirmed.

Reversed and rendered in part, and affirmed in part.

### On Motion for Rehearing.

The facts in this case are stated in our original opinion and also stated, in a more concise form, in our certificate to the Supreme Court, to be hereinafter referred to. On original hearing, as will appear from our original opinion, we affirmed the judgment below except as to the trustee in bankruptcy; but being in doubt of the correctness of our conclusions, we certified to the Supreme Court for determination, among other things, the following question:

"Did the knowledge of the bank that one-third of the proceeds deposited by Graves during the course of his business was the proceeds of cattle sold by the commission company for individual shippers have the effect to place upon the bank the burden of making inquiry and ascertaining for itself the persons to whom such trust funds in fact belonged, and hence render unauthorized the offsets above shown to the commission company's overdraft?"

The certificate was referred to Section B of the Commission of Appeals, and in an opinion by Presiding Judge Ben H. Powell, approved by the Supreme Court, it was held, after a review of numerous authorities, that:

"The actual knowledge on the part of the bank that the Graves deposit consisted, in part, of trust funds placed upon the bank the burden of making inquiry before appropriating any of that deposit in payment of its own overdraft against Graves. If all of the Graves deposit had belonged to the shippers, within the knowledge of the bank, the latter certainly could not have appropriated any of the funds to its overdraft against Graves. The bank, knowing the deposit contained trust funds, must separate the trust funds in said deposit from the Graves funds therein before it makes an appropriation from the deposit to pay the Graves overdraft. The funds were mixed by Graves. The bank knew they were mixed. Therefore, under a rule as old as the law itself, the entire deposit will be treated as trust funds except so far as the bank might, upon inquiry, be able to distinguish the trust funds in said deposit from those therein belonging to Graves personally."

Under such findings, by which we are bound, we see no escape from the conclusion that the appropriation of the funds in controversy in this case to the payment of Graves' overdraft was unauthorized, for it is undisputed in the evidence that the bank

had actual knowledge that at least a part of the funds on deposit with it to Graves' credit belonged in equity to parties for whom Graves, as a broker, had sold cattle, and it is further undisputed that the bank in fact made no separation between the trust funds belonging to others and Graves.

It is vigorously insisted in behalf of the bank that the funds on deposit in the bank were not trust funds in fact, and that our Supreme Court did not so decide; but we have been unable to concur in this contention. We entertain no doubt of the fact that at least a large part of the funds on deposit in the bank to Graves' credit was a trust fund. See Central National Bank v. Connecticut Mutual Life Insurance Co., 104 U. S. 67, 26 L. Ed. 693; Union Stockyards National Bank v. Gillespie, 137 U. S. 411, 11 S. Ct. 118, 34 L. Ed. 724; Union Stockyards National Bank v. Moore, 79 F. 705, 25 C. C. A. 150, cited with approval by our Supreme Court. See, also, Cady v. South Omaha National Bank, 46 Neb. 756, 65 N. W. 906; Clemmer v. Drovers' National Bank, 157 Ill. 206, 41 N. E. 731; Boyle v. Northwestern National Bank, 125 Wis. 498, 103 N. W. 1123, 104 N. W. 917, 1 L. R. A. (N. S.) 1110, 110 Am. St. Rep. 844; Bills v. Schliep, 127 F. 107, 62 C. C. A. 103; Interstate National Bank v. Claxton (Tex. Civ. App.) 77 S. W. 44; Commission Company v. Beatty, 42 Okl. 721, 142 P. 1102.

Nor do we think it can be said that our Supreme Court did not so decide. As we read the opinion of the Supreme Court, the fund in controversy was treated as a trust fund throughout the entire opinion, and this view is emphasized by the fact, as appears from copies of appellants' briefs and arguments in the Supreme Court, both on the original hearing and upon a motion for rehearing, that the contention was expressly presented that the fund in fact was not a trust fund. As evidence of this, and also as presenting appellants' views as now and here urged, we quote the following from the argument in behalf of the Stockyards National Bank in the Supreme Court:

"Upon sale of the cattle, Graves came into possession, and had the legal title, of the purchase money, and the shippers had the equitable title thereto. With consent of the shippers, Graves deposited this money in bank to his individual and personal credit. The shippers also agreed that Graves could pay them by his checks drawn on his individual and personal account. By the deposit made under such circumstances, the legal title to said money was divested out of the shippers, and both titles were vested in the bank; and, in so far as Graves and the shippers are concerned, the bank became the legal and the equitable owner of the money, and the relation of debtor and creditor was established between the bank and Graves in respect to the money. When the shippers consented to the divestiture of their equitable title in the money and to the vesting of that title in the bank, to the creation of the relation of debtor and creditor between the bank and Graves in respect to said money, and to accept payment by Graves' personal check, then the trust character of the money was destroyed. Therefore the shippers cannot follow the money in the possession of the bank on the theory that it is trust funds."

Also the third point of the bank's motion for rehearing is as follows:

"Third. This court erred in holding that the credit to Graves offset by the bank against his overdraft was a trust fund."

Among other things, the Commission of Appeals, in answer to the motion before it for rehearing, said:

"We have carefully considered motion for rehearing filed herein by appellee. We think the same is without merit and recommend that it be overruled."

[7] We are of the opinion that the foregoing conclusions, together with those announced in the opinion on certified questions, are the vital ones presented in this case, and that we need not therefore discuss other contentions made in behalf of the appellee bank. We accordingly conclude, it having been so agreed by counsel for all parties in this case other than appellee bank and the intervening carriers, that the judgment below in favor of the trustee in bankruptcy for the sum of $317.85, together with his costs and interest as adjudged, be and the same is hereby affirmed; that as to the interveners other than the carriers the judgment below should be reversed and here rendered in their favor for the amount applied by the appellee bank in payment of Graves' overdraft, to wit, $14,268.62, together with interest thereon at the legal rate from the date of said appropriation, to wit, from and after September 30, 1918; said sum to be prorated among said interveners in proportion to their several debts against Graves. As to the intervener carriers, we conclude, as announced in our original opinion, that the judgment against them must be affirmed; it being our conclusion that as to the sums claimed by the carriers, Graves was but their debtor, and it not appearing that the appellee bank had notice of any kind that any part of Graves' deposits belonged to the carriers as freight. This conclusion, however, is not to be construed as prohibiting the prosecution of the carriers' claims for freight, if any they have, against the several owners of the cattle shipped to and sold by Graves, and upon which the freight was not paid.

[8] In explanation of the process by which we arrived at the amount for which the appellee bank was liable to the intervening shippers, we should perhaps add that as shown in our opinion on original hearing,

between the dates of September 30, 1918, when Graves' overdrafts of $45,744.69 was paid by the bank, and October 6, 1918, the total deposits made by Graves aggregated $179,132.70. Of that amount $153,135.21 was the proceeds of sales of all cattle sold by Graves on commission during that period; and $92,889.63 of that sum represented the proceeds of cattle sold by Graves for the shippers who are plaintiffs in this case. Therefore, $179,132.70 minus $153,135.21 leaves $25,997.49, which appears to be the amount realized by Graves from his own individual cattle and in which none of the shippers had any interest; and unquestionably the bank had the right to apply that sum upon the indebtedness of $45,744.69, which Graves owed it by its payment of his overdrafts on September 30th. See Michie on Banks and Banking, vol. 2, p. 1009, § 134 et seq. The total amount of checks given by Graves on the account during the period above mentioned, beginning October 1st and ending October 5th, was $138,886.55. That total subtracted from the total deposits during the same period of $179,132.70 leaves an excess of deposits over checks of $40,-266.70. The shippers are claiming that entire excess. The bank has applied the whole of that excess to the payment of Graves' said overdrafts. The bank had the right to apply $25,997.49 to said overdrafts, since Graves had that amount in the deposits which belonged to him individually; but the balance of such excess, to wit, $14,268.62 could not be so applied because it belonged to the shippers. Therefore the shippers are entitled to recover of the bank $14,268.62.

[9] The bank applied the deposits made during the first five days in October, in part, to the liquidation of the prior overdrafts of Graves, on each day those deposits were made. It had the right and it was its duty to pay the checks drawn by Graves during that period out of the trust fund regardless of the purpose for which those checks were given. Graves had the authority of the shippers to so expend the trust fund, and it was not the duty of the bank to question that authority. After it had rightfully paid those checks out of the trust fund, in part, it certainly was entitled to credit therefor as against the demand of the shippers now made. That question is settled by the Claxton Case, upon which the shippers chiefly relied. Hence the shippers are in no position now to urge the contention that $65,000 of the checks so paid was paid out to satisfy Graves' individual debts, or for his individual benefit, and therefore those checks should not be charged against the trust fund until after his individual deposits were exhausted.

For the reasons stated, it is ordered that the motions for rehearing in behalf of the trustee in bankruptcy and of the several interveners be granted; that the judgment below be affirmed as to the trustee in bankruptcy, but as to the intervening shippers reversed and here rendered in their favor, as herein above declared.

BUCK, J., not sitting.