**ABILENE HOTEL CORPORATION et al.**
*v. GILL et al.*
No. 2639.

Court of Civil Appeals of Texas. Waco.
May 3, 1945.

Rehearing Denied May 24, 1945.

McMahon, Springer & Smart, of Abilene, for appellants.

Scarborough, Yates & Scarborough, Sayles & Sayles, Smith & Eplen, Thomas E. Hayden, J. R. Black, and Wagstaff, Harwell, Douthit & Alvis, all of Abilene, for appellees.

HALE, Justice.

This is an action in the nature of a bill of interpleader. It was instituted by C. W. Gill, M. M. Meek and Henry James as trustees against two groups of adverse claimants to a fund of $17,974.21 alleged to be in the possession of plaintiffs. The purpose of the suit was to determine the rightful ownership of the fund in controversy. One group of claimants to the fund consisted of Lone Star Townsite Co. and 67 others, hereafter referred to as "landowners." The other group of claimants consisted of Abilene Hotel Corporation and 16 additional named defendants who were sued individually and as representatives of a class of some 500 persons, hereafter referred to as "certificate holders."

The case was submitted to the court below without the aid of a jury on an agreed statement of facts and resulted in judgment that the certificate holders take nothing and that plaintiffs pay said fund over to the landowners. The certificate holders have appealed. They say the judgment should be reversed and here rendered in their favor, directing plaintiffs to pay said fund over to them. In order to understand the contentions of the respective parties it is deemed proper to set forth an extended statement of the factual background out of which the controversy arose.

In 1940 certain citizens of Abilene, Texas, originated an enterprise looking to the establishment of a military camp in that community by the United States Government. In order to raise the funds necessary to finance the proposed project, each interested citizen executed a separate agreement in writing by the terms of which he agreed to pay on demand to plaintiffs as trustees the amount therein specified and upon the payment of such subscription the trustees were to issue and they did issue to each subscriber a certificate evidencing his beneficial interest in the fund thus created. The sum of money so raised was thereafter used by the trustees to buy in fee simple the land upon which Camp Barkeley was to be located. The campsite was then leased by the trustees to the Government upon terms which are not shown in this record.

The subscription agreement executed by each certificate holder recited in part as follows:

"As one interested in behalf of Abilene, Texas this obligation represents my sub-scription to costs and expenses incident thereto in leasing and acquiring title to certain real estate and leases near View, Texas for a proposed Government Army and/or Training Camp to be established in that vicinity or for the purchase or lease of land for Air Fields or any other National Defense Project proposed to be established in Taylor and/or adjoining Counties, Texas in the vicinity of Abilene.

\* \* \* \* \*

"The only interest we shall have hereafter as a subscriber is with other subscribers for our pro rata part of the proceeds of the sale of the whole or any part of said properties at any time hereafter made by said Trustees, less actual expenses of acquiring, handling, selling and disposing of same \* \* \*."

As a part of the proposed enterprise and in order to provide a proper training ground and maneuver area for the military forces, it was necessary for the Government to acquire the right to use a large terrain, consisting of 68,412.94 acres, in addition to the land upon which the actual campsite was located. To this end each of the 68 landowners executed a separate agreement in writing with plaintiffs as trustees by the terms of which each, for a recited consideration of $1 and the payment of further rentals as specified, did grant to the trustees a lease upon certain land, with authority to sublet the premises to the Government for the express use therein designated. Although each of the so-called leases embraced the same identical general terms, there was a variation in the amount of land covered in each lease, the amount of rentals to be paid to each landowner per acre and the use to be made of the leased premises. In some of the leases the rental was on a basis of $.50 per acre per annum, in others it was on the basis of $1 per acre, while in still others it was on a basis of $1.50 or of $2 per acre and in some few instances a bonus was provided for in addition to the annual rental per acre. Some of the tracts were to be used as an artillery target and firing area, some as an infantry combat firing area and others as an infantry maneuver area. The total amount of the acreage for these three uses was as follows: (1)

artillery target and firing area, approximately 30,366 acres; (2) infantry combat firing area, 9,458 acres; and (3) infantry maneuver area, 28,588 acres. The total aggregate amount of the annual rentals and bonuses to be paid separately to the several landowners for the acreage as divided into the three uses aforesaid was as follows: (1) for the 30,366 acres, $34,925.74; (2) for the 9,458 acres, $9,430.13; and (3) for the 28,588 acres, $17,374.76.

The lease agreement from each landowner to the plaintiffs as trustees recited in part as follows:

"This lease is for the purpose of assigning or subleasing said property to the Government to be used exclusively for the following purposes: (in some of the leases the use here specified was 'artillery target and firing area,' in some it was 'infantry combat firing area' and in others. it was 'infantry maneuver area'.) As consideration there will be paid to the undersigned the sum of (in some instances $.50, in others $1.00 or $1.50 or $2.00) per acre per annum, with the option to renew and continue the lease from year to year at the same rate until June 30, 1966.

"It is understood that this property will be included by the trustees in a blanket lease to the Government, the consideration for which is paid by the Finance Officer, U. S. Army, Fort Sam Houston, Texas at the end of each quarter, and within 15 days after receipt of such consideration the Trustees will pay the amount above set forth, so long as said land may be under lease by the Government, and upon the Government's surrendering the land then this lease shall terminate."

Each lease from the landowners to the plaintiffs as trustees further provided in substance that the rent therein stipulated should be full and entire compensation for any and all use made of the land for the purpose therein designated and that no claim for damages to the land resulting from such use would be made; provided, however, that such agreement should not preclude a claim for extraordinary damages resulting from the occupancy, but not incident to the use of the land for the purposes therein specified. Each lease further recited that lessor "hereby agrees that the trustees and/or Government shall not be liable, during the life of this lease or any renewal thereof, for the loss of or damage of any nature to persons or livestock that may be on any premises save

for the loss of or damage due to negligence on the part of the Government or its agents or employees."

After the separate leases had been thus executed and delivered by the landowners to the plaintiffs as trustees, the latter then entered into a blanket lease agreement with the Government under date of January 2, 1941, by the terms of which they leased to the Government the entire 68,412.94 acres for an agreed annual rental of $68,-412.94, one-fourth of the annual rental to be paid to the trustees at the end of each quarter by the Finance Officer of the U. S. Army. This blanket lease showed the name of each landowner, the amount of acreage leased by each to the trustees, the use to which the land would be put by the Government and the amount of rentals which the plaintiffs as trustees had agreed to pay to each landowner for the use of his premises. It also covered various covenants and agreements with respect to the use of the leased premises by the Government, the compensation to be paid for such use and the liability of the Government for extraordinary damage resulting from its negligence, if any, by reason of such occupancy, these covenants and agreements being substantially the same as those contained in the separate lease agreements by the several landowners to the plaintiffs as trustees.

The total amount received from the Government by the plaintiffs as trustees under the blanket lease agreement, after deducting all allowable expenses and charges incurred by the trustees in handling the transaction, is at this time the sum of $15,493.92 over and above the total aggregate amount provided for in the separate leases by the landowners to the trustees and is the amount which the trial court disposed of in the judgment below.

It was agreed among the landowners that if the plaintiffs as trustees should be directed by the court to pay the fund in controversy to them, such fund should be divided among them on an acreage basis and that is the basis upon which the fund was apportioned as between the landowners.

The certificate holders as appellants contend here in substance that each separate lease from the landowners to plaintiffs as trustees represented an "arm's length" transaction between each landowner and the trustees; that no fiduciary or trust relationship, express or implied, arose thereby as between the trustees and the landowners; and that each separate lease created an unconditional obligation on the part of the trustees to pay to each landowner separately the rentals stipulated in each lease. Therefore, they say that since the trustees would have been liable to each of the respective landowners for any deficiency in the payment of the stipulated rentals, the certificate holders as cestui que trustents are entitled to receive the excess rentals now in the possession of plaintiffs as their trustees.

On the other hand, the landowners as appellees contend in substance that each separate lease from them to plaintiffs as trustees and all of the separate leases, when considered together with the blanket lease by the trustees to the Government, constituted in legal effect a power of attorney from the landowners appointing the trustees as their special agents for the purpose of assigning or subleasing the properties to the Government to be used exclusively by it for the specific objects therein designated; that the powers thereby vested in such trustees made them agents or trustees for the landowners and required them as such agents or trustees to account to the landowners for any excess rentals they might receive from the Government under the blanket lease; and that it was not contemplated by any of the parties that any of the money subscribed and paid in by the certificate holders should be used to pay all or any part of the stipulated rentals. Therefore, they say that since the Government alone was to pay and did pay the rentals provided for in all of the lease agreements, they are entitled to receive the excess rentals now in the possession of plaintiffs.

In passing upon the foregoing contentions it is the duty of this court to view the evidence contained in the agreed statement of facts and all reasonable inferences and deductions that may be drawn therefrom in the light most favorable to the landowners because we must assume that the trial court found all issuable facts raised by the evidence, if any, in support of the judgment appealed from. The certificate holders have not cited any legal authority in support of their contentions and notwithstanding their able arguments we are unable to agree with the ultimate conclusions of fact and law which they urge.

712

Although the agreed statement of facts upon which the case was submitted does not affirmatively disclose any of the negotiations which transpired between the trustees and the landowners with respect to the execution and delivery of the separate lease agreements, we do not think the trial court was necessarily required to conclude from all of the evidence that each separate lease agreement represented an "arm's length" transaction between each landowner and the trustees or that no fiduciary relationship arose thereby. Each landowner reserved the right under all of the leases to use the leased premises, subject to the right of user granted to the Government. In our opinion, the trial court was warranted in concluding that the hazards to the landowners whose lands were to be used as an artillery target and firing area were greater than the hazards to those whose lands were to be used only as an infantry maneuver area and that the variation in the agreed amount of rentals to be paid per acre to each landowner resulted from a good-faith effort on the part of the trustees to pro-rate the total consideration to be paid by the Government under the blanket lease, less the expenses to be incurred in handling the transaction, among the several landowners on a just and fair basis, with due regard to the location of each separate tract and the use to be made of the same by the Government.

Moreover, it does not appear that there was any intention on the part of any of the parties that any one except the Government should use the leased premises or become obligated ultimately to pay the landowners the stipulated rentals for such use. There was no unconditional written promise on the part of the trustees, either personally or on behalf of the certificate holders, to pay any sum to the landowners as rentals, their only obligation in this regard being to pay the stipulated rentals "within fifteen days after the receipt of such consideration" from the Finance Officer of the U. S. Army.

Since the right to use land is ordinarily an incident to its ownership and right of possession, it is generally held that the ownership of rentals arising from such use follows the ownership of the land from which such rentals are derived. 36 C.J., p. 364, Sec. 1205; 32 Am.Jur., p. 360, Sec. 442; Porter v. Sweeney, 61 Tex. 213; Hearne v. Lewis, 78 Tex. 276, 14 S.W. 572; Caruthers v. Leonard, Tex.

Com.App., 254 S.W. 779; Butt v. Ellett, 19 Wall. 544, 22 L.Ed. 183. We see no reason why this rule should not apply to the facts of this case.

From the entire record before us we cannot say that the trial court was required as a matter of law to direct the plaintiffs to pay the fund in controversy to the certificate holders. On the contrary, it appears to us that plaintiffs were acting as agents or trustees for the landowners in the execution of the blanket lease and in the receipt of the rentals paid to them thereunder by the Government and hence it follows that the landowners, and not the certificate holders, were the equitable and rightful owners of the fund. 42 Tex.Jur., p. 636 et seq.; Ash v. A. B. Frank & Co., 142 S.W. 42 (er. dis.); Kinzbach Tool Co. v. Corbett-Wallace Corporation, 138 Tex. 565, 160 S.W.2d 509.

Therefore, all of appellants' points are overruled, and the judgment appealed from is affirmed.

On Motion for Rehearing.

In their motion for rehearing appellants say that since the matters here in controversy were submitted to the court below upon an agreed statement of facts, and since that court filed express findings of fact and conclusions of law, this court materially erred by viewing the evidence contained in the agreed statement and such reasonable inferences and deductions as may properly be drawn therefrom in the light most favorable to the landowners.

We recognize that when a case is submitted to the court upon an agreed statement of facts in accordance with the provisions of Rule 263, Texas Rules of Civil Procedure, the court is confined as a general rule, in the absence of some agreement to the contrary, to the facts contained in such statement. Texas-Mexican R. Co. v. Scott, 60 Tex.Civ.App. 482, 129 S.W. 1170. Ordinarily the court is without authority, under such circumstances, to draw any inference or find any fact not embraced in the agreement unless as a matter of law such further inference or fact is necessarily compelled by the evidentiary facts agreed upon. Hutcherson et al v. Sovereign Camp W. O. W., 112 Tex. 551, 251 S.W. 491. However, we do not think this general rule is material to the contentions urged by appellants or that it is of controlling effect in its application

to the record now before us for reasons which we shall note briefly.

The agreed statement upon which this case ·was tried is voluminous and complicated. Although it contains numerous exhibits and the recitation of various evidentiary matters, it does not contain any express provision as to whether each separate lease agreement represented an "arm's length" transaction between each landowner and the trustees or as to whether such leases created a fiduciary relationship between the parties thereto. The trial judge did not make any express finding on these issues but by reference he adopted the agreed statement of facts in its entirety as his findings and thereupon he concluded generally that the landowners, and not the certificate holders, were the rightful owners of the fund in controversy. After he had thus filed his original findings of fact and conclusions of law, none of the parties thereafter requested of him any further, additional or amended findings.

Under the pleadings and the agreed statement in this case the plaintiffs were undoubtedly entitled to a judgment relieving them from further liability to either of the two groups of adverse claimants to the fund in controversy. But in order to grant them the relief to which they were thus entitled it was necessary for the trial court to determine the rightful ownership of the fund as between the two contending groups of claimants. The certificate holders as appellants in this court contend that a material issue in determining the rightful ownership of the fund was and is whether each separate lease agreement represented an "arm's length" transaction. While this ultimate issue was not directly disposed of in the agreed statement or in the express findings of the trial court, we think the evidence contained in the agreed statement necessarily compelled the inference that plaintiffs were acting as agents or trustees for the landowners in the execution of all the leases. If so, then it necessarily follows that each separate lease agreement did not represent an "arm's length" transaction.

But if the evidence in the agreed statement did not compel an inference as a matter of law that each separate lease did or did not represent an "arm's length" transaction as distinguished from a fiduciary relationship, then we think it must be held that since the parties submitted the case to the court upon the agreed state-

ment under the circumstances here involved they thereby intended and in effect agreed that the trial court might make his own findings upon any ultimate material issue of fact, if any, raised by the evidence contained in the agreed statement. If so, then it was and is the duty of this court, in passing upon the contentions here asserted, to view the evidence contained in the agreed statement and the reasonable inferences and deductions that may be drawn therefrom in the light most favorable to the landowners and to assume that the trial court found all issuable facts raised thereby, if any, in support of the judgment appealed from. Besteiro v. Besteiro, Tex.Com.App., 65 S.W.2d 759, point 5, Eaton v. Husted, 141 Tex. 349, 172 S.W.2d 493, point 2; Steere v. Stockyards Nat. Bank, Tex.Civ.App., 266 S.W. 531, point 2, err. ref.; Patterson v. Farmers' Royalty Holdings Co., Tex.Civ.App., 79 S.W.2d 917, point 1, err. dis.; Straus v. Shamblin, Tex.Civ.App., 120 S.W.2d 598, point 4, err. dis.; Corbett v. State et al., Tex.Civ.App., 153 S.W.2d 664, point 2, err. ref.

Having carefully considered the motion of appellants for rehearing, we have concluded the same should be overruled, and it is accordingly so ordered.