STATE, EX REL. O. S. SPILLMAN, ATTORNEY GENERAL, V. DUNBAR STATE BANK ET AL., APPELLANTS: HENRY G. SEYFER ET AL., INTERVENERS, APPELLEES.

FILED OCTOBER 17, 1930. No. 26943.

C. M. Skiles, Albert S. Johnston and I. D. Beynon, for appellants.

Pitzer & Tyler, D. W. Livingston, Congdon, Finlayson & Burke and Bertrand V. Tibbels, contra.

Heard before Goss, C. J., Dean, Good, Thompson, Eberly and Day, JJ.

Per Curiam.

This is an action to establish the two claims of Seyfer et al. and the First National Bank for deposits in the now defunct Dunbar State Bank, payable from the state guaranty fund. It is now before the court on rehearing. The court formerly adopted an opinion in this case, reported in 230 N. W. 99, which opinion it now withdraws. There is no dispute as to the material facts in this case. The record establishes the following situation: The Dunbar State Bank was taken over by the guaranty fund commission April 4, 1927. It was a "one man" bank with one Murray as president and only active officer directing and controlling its affairs until he departed for parts unknown in March, 1927. While Murray was thus operating this bank and exercising sole control over its affairs, he discounted at other banks three forged notes for $5,000 each, two of which are involved in this controversy, and one of which was involved in United States Nat. Bank v. Dunbar State Bank, 118 Neb. 624. These transactions followed the established course of business and in the same manner legitimate transactions had been handled by the bank for many years. One of these notes was discounted by the Merchants National Bank of Nebraska City, the other by the First National Bank of Omaha. The proceeds of each note were credited to the Dunbar State Bank, which credits were exhausted by drafts drawn thereon by the Dunbar State Bank in the usual course of its banking business. Seyfer et al., who were directors of the Dunbar State Bank, paid the Merchants National Bank of Nebraska City the amount due on the note it dis-

counted pursuant to an agreement of guaranty and prosecuted this claim. Their claim was consolidated for trial with the claim of the First National Bank of Omaha. The transactions are identical as related to the Dunbar State Bank. At a time approximately that of the discount of these notes, Murray, in order to balance the books of the bank, opened two checking accounts, one in the name of "Thomas B. Murray, Special," and the other, "Thomas B. Murray, Trustee." Deposits were indicated equal to the amount of the discounts of these two notes. There is no question but that as a result of these transactions money or its equivalent was received by the Dunbar State Bank. These claims were presented to the trial court as constituting valid deposits for which the guaranty fund is liable and by the court allowed as such.

As preliminary to the discussion of this case, it is to be remembered that, prior to the adoption of the present state banking act, which now appears as sections 7982 to 8051, Comp. St. 1922, there existed in this state, in part by common law and in part by statute, a complete definition of the rights, liabilities, duties and powers of banks and those dealing with them in the character of depositors or otherwise. The present banking act was in effect superimposed upon the law as previously existing. The latter was changed only so far as expressly amended or as required by necessary implication to remove inconsistencies or repugnancies which might otherwise exist. Our present banking act bears internal evidence of the fact that it was framed with the law previously existing in contemplation of the legislature. Thus, there is even now no specific statutory definition of the terms "deposit" or "depositor" in the act before us. Indeed, the present law in terms purports to make no change in the rights and liabilities springing from this relation so far as the corporate entity, "the bank itself," is concerned. With reference to the guaranty fund therein provided, however, it expressly excludes from participation therein as deposits certain transactions which prior to its adoption were regarded as creating deposits. These exclusions are in the nature of exceptions to the rule of law

previously existing and are to be construed as such. If this is correct, we are justified in the conclusion that whatever transactions with a bank which previously entitled the participants therein to the rights of depositors were in effect, by the present law, continued as such and are protected by the guaranty fund, unless and except expressly excluded by the express terms or necessary implication of the new act or of the amendments thereto. There can now be no question that prior to the adoption of the present state banking act the deposit by a criminal, in a bank, of the proceeds of his crime, such as robbery, larceny and forgery, could be claimed from the depositee bank by the true owner as his own "deposit." *Aetna Indemnity Co. v. Malone,* 89 Neb. 260; *Lamb v. Rooney,* 72 Neb. 322; *Nebraska Nat. Bank v. Johnson,* 51 Neb. 546; *Logan v. Aabel,* 90 Neb. 754. Indeed, the rule recognized by this court was broader than above suggested. *Cady v. South Omaha Nat. Bank,* 46 Neb. 756.

It must be admitted that there is no express declaration in the present banking act as to stolen property or property obtained as the result of crime or the proceeds thereof deposited in a bank by a thief or criminal. In view of the fact that this criminal who obtained the property in controversy by criminal means was the president and active managing officer of the bank, recovery lies against the corporate bank involved and against its officers and stockholders. This is in strict accord with the unquestioned rule which is: "It is certain that a trust deposit received by a solvent bank knowing its true character can be recovered. Nor is its recovery conditioned in any way on its existence. Thus, a bank which credits the account of a depositor with a forged check can follow the money into the possession of any one who received it with knowledge of the fraud." 1 Bolles, Modern Law of Banking, p. 504. It is contended by the appellants that the right of the claimants to recover ought to be denied on the ground that the trustee *ex maleficio* who made the deposit was the active managing agent of the Dunbar State Bank, whose real purpose it was by the transactions in question to effect in truth and in fact a loan of funds to his institution. Nowhere in the present

banking act is there an express or implied denial of the right of a *cestui que trust* to recover, as a deposit, a deposit of his trust funds. Even if we concede that the contract before us, if made by Murray in his own behalf and for his private benefit as principal, would not be within the limitation of the guaranty fund because of the statutory prohibition in section 8033, Comp. St. 1922, as amended by section 24, ch. 191, Laws 1923, still the contention of appellant does not follow. Murray in this transaction, in contemplation of law, appears solely in the capacity of trustee *ex maleficio*. It would seem that the rule applicable is that the law does not require that a trustee as such in his individual capacity should have the competency to make the contract for himself or in his own behalf which he may legally make as trustee in behalf of his trust or principal. In support of this, attention is called to the following authorities: The rule applicable to this situation seems to be: "It is by no means necessary for a person to be *sui juris,* or capable of acting in his or her own right, in order to qualify himself or herself to act for others; and it is generally held that any one, except a lunatic, imbecile, or infant of tender years, may be capable of acting as agent for another, although he is not capable of acting for himself." 2 C. J. 430. Indeed, Justice Story, in his work on Agency, makes the following observation in this connection: "It is by no means necessary for a person to be *sui juris,* or capable of acting in his or her own right, in order to qualify himself or herself to act for others. Thus, for example, monks, infants, femes covert, persons attainted, outlawed or excommunicated, villains and aliens, may be agents for others." Story, Agency (9th ed.) p. 8. So, too, it was uniformly held that, during the existence of slavery in the United States, a master could constitute his slave his agent, whose contract would bind himself. Indeed, it was said: "A slave, who is *homo non civilis,* a person who is but little above a mere brute in legal rights, may act as the agent of his owner or his hirer." *Lyon & Co. v. Kent, Payne & Co.,* 45 Ala. 656, 663. "It is not questioned, that a master may constitute his slave his agent, and I cannot conceive of any

distinction between the circumstances which constitute a slave and a freeman an agent—they are both the creatures of the principal, and act upon his authority. There is no condition, however degraded, which deprives one of the right to act as a private agent." *Chastain v. Bowman,* 16 S. Car. Law, 270, 271.

While it must be conceded that there is a well-recognized difference between the power of an agent and a trustee, yet so far as the transaction before us is concerned there is a well-established analogy between them. It is to be remembered that equity has created the doctrine of trustee *ex maleficio* for the purpose of securing the return of funds taken as a result of fraud or theft from the true owners thereof. The foundation principle of equity in this connection is that, where all parties in interest are affected by notice of the actual facts, it concedes no power to such trustee to find the fund or in any manner affect the rights of the *cestui que trust* therein in the slightest degree by his conduct, his acts or his contracts. The underlying principle which supports recovery by the true owner in these cases is that the *cestui que trust* claims the money, the deposit, the note, or the item of personal property into which the money has gone, as his own property, not as a debt to him from the possessor of the property claimed. The fundamental controlling maxim in this connection is that "He who does an act through another is deemed in law to do it himself." While the intent, purpose, acts, conduct, contracts or situation of the trustee *ex maleficio* may not affect trust property in his hands which he does not own and merely possesses, still equity, disregarding all evil intent and purposes on the part of such trustee, holds the unlawful delivery of the trust estate to a person having actual knowledge of the true facts, at the election of the defrauded *cestui que trust,* as in law the act of the *cestui que trust,* and thus enables the latter to recover the property unlawfully disposed of by the defaulting trustee.

Applying this principle to the instant case, we conclude that, though the hand of Murray obtained the money, delivered it to the Dunbar State Bank and wrote the entries in the records thereof, in law the money was actually de-

livered to this bank by the *cestui que trust* himself through the hands of Murray. The record in this case furnishes no facts from which it can be implied that these defrauded banks, who parted with the possession, though not the title, of their money on the strength of forged notes, had any knowledge of the true situation or were actuated by any motives denounced by section 8033, Comp. St. 1922, as amended by section 24, ch. 191, Laws 1923. And to say that the rights of the *cestui que trust,* who is admittedly innocent of evil intent, can be affected by the intent and purposes of a trustee *ex maleficio* dealing with stolen funds obtained from such *cestui que trust* and with parties who had actual notice of the real situation is to state a conclusion wholly at variance with the conceded principles of law. And as in law the *cestuis que trust* by the hand of their trustee *ex maleficio* placed this money in the Dunbar State Bank's control and by the same hand accepted the rights of a depositor which they were entitled to enforce under the law of the land; their rights so to do cannot be modified or affected by the purposes, intent or motives of a thief or criminal whose possession in his private capacity created no title to or rightful control over the property in suit. Such was the undoubted rule before the adoption of our present banking act. *Newton v. Porter,* 5 Lans. (N. Y.) 416; *Hoffman v. Carow,* 22 Wend. (N. Y.) 285; *Bassett v. Spofford,* 45 N. Y. 387. This act does not in terms purport to change the established principle that the true owner is wholly unaffected by the acts of a criminal who by criminal means has secured possession of his property as to all who know of that fact. This is the interpretation which this court has universally given the present banking act as heretofore applied. Thus, in *State v. Brown County Bank,* 112 Neb. 642, it was held: "When a bank receives the proceeds of chattels on which a third party held a valid first mortgage, with knowledge that the sale was made without the consent of the mortgagee, and that the ownership of the deposit is in the mortgagee, it is liable to the mortgagee for the sum deposited,

and if the bank becomes insolvent before paying the same, the mortgagee may enforce payment from the guaranty fund." It will not be denied that the mortgagor who made this unlawful sale and deposit must be regarded as a trustee *ex maleficio*. So, too, in the following cases referred to as the Wentz cases: *State v. American State Bank,* 108 Neb. 111; *State v. American State Bank,* 108 Neb. 124; *State v. American State Bank,* 108 Neb. 129. Wentz, in violation of his duties as managing officer of the bank, criminally diverted funds from their lawful channel to his own enrichment. It was held that the bank and guaranty fund were liable. It will be noted that Wentz was a trustee *ex maleficio* and that each of the transactions referred to in these cases arose and the decisions were made since the adoption of the amendment of 1917. Also, in *United States Nat. Bank v. Dunbar State Bank,* 118 Neb. 624, we find a case where an action was brought to recover the proceeds of one of the three forged notes hereinbefore referred to by the bank to which it was negotiated as a valid loan. In that case on facts identical with those here presented this court held: "Proceeds of a forged note indorsed by the payee to a state bank and by the latter knowingly and fraudulently uttered and negotiated at its face value may be traced into such bank, identified as a deposit therein, and so treated in a suit in equity by the party defrauded"—and awarded judgment against the guaranty fund. It is to be noted that this case is strictly in accord with principles that determined the Wentz cases above cited. This case is controlled by *State v. Brown County Bank,* 112 Neb 642, and *United States Nat. Bank v. Dunbar State Bank,* 118 Neb. 624.

The court is unanimously of the opinion that these opinions state the law applicable to these cases, and, in conformance to the rules there announced, the judgment of the trial court is affirmed and the former opinion is withdrawn.

AFFIRMED.